COMPREHENSIVE ACCOUNTING SERVICE COMPANY
v. THE MARYLAND STATE BOARD OF
PUBLIC ACCOUNTANCY

[No. 51, September Term, 1978.]

*Decided February 22, 1979.*

*Thomas A. Mass* and *Joseph S. Kaufman* for appellant.

*F. Todd Taylor, Jr., Assistant Attorney General,* with whom was *Francis B. Burch, Attorney General,* on the brief, for appellee.

MURPHY, C. J., delivered the opinion of the Court.

We granted certiorari in this case prior to decision by the Court of Special Appeals primarily to consider the constitutionality under the first and fourteenth amendments to the federal constitution of a statute which prohibits a non-certified accountant from holding itself out to the public as an "accountant" or describing the services it performs as "accounting" services.

## (1)

The practice of public accountancy in Maryland is regulated by the State Board of Public Accountancy (the Board)

pursuant to the provisions of Maryland Code (1957, 1975 Repl. Vol.), Art. 75A. The Board is authorized by § 2 to issue the certificate of "certified public accountant" to those who meet the stringent educational, experience and other eligibility requirements of the statute. Under § 7 persons or partnerships, who registered with the Board prior to January 1, 1925 as "public accountants," and who received certificates as such, are entitled to style themselves as "public accountants."

Section 11 (a) provides that the Board "shall on application enroll to engage in the practice of public accounting in this State ... all holders of certificates as Maryland certified public accountants or registered public accountants ...." Section 11 (c) provides that failure of a certificate holder or registrant to obtain an enrollment certificate "shall deprive him of the right to engage or continue in the practice of public accounting ...." Section 22 (d) defines the term "enrollment certificate" to mean "a certificate which has been issued by the Board under § 11 as evidence that the person or partnership named therein has been enrolled to practice public accounting ...." The practice of public accounting is not defined by the statute.

Section 14 (a) prohibits any person, not a "certified public accountant," from using that title, or the abbreviation "C.P.A." or any other word or title "likely to be confused with 'certified public accountant' or 'C.P.A.'" Section 14 (b) prohibits any person, not holding a certificate under § 7 as a "public accountant," or a C.P.A., from using the title "public accountant" or any other title, designation or words, "or any abbreviation, tending to indicate that such person is a public accountant." Sections 14 (c) and (d) prohibit persons and firms from engaging in or holding themselves out to the public as engaged in the practice of public accountancy either as a "certified public accountant" or a "public accountant" unless an enrollment certificate has been issued under § 11.

Section 14 (e) provides that no person, partnership or corporation not holding an enrollment certificate:

"shall practice or hold himself or itself out to the public as 'accountant' or 'auditor' in connection with

his own or any other name, nor describe or designate the services offered or performed by him or it as 'accounting' or 'auditing,' with or without any other designation or description . . . ."

Section 15 (e) provides that nothing in the statute shall be construed to prohibit any person from:

"Offering or rendering to the public bookkeeping and tax services, including devising and installing systems, recording and presentation of financial information or data, preparing financial statements, schedules, reports and exhibits, or similar services; provided that persons who offer or perform the above-mentioned services shall not represent that an 'audit' or 'examination' has been made by them, shall not furnish written certificates or opinions concerning the correctness, fairness or fair presentation of financial statements, schedules, reports, or exhibits, and shall not perform any act prohibited by § 14."

Section 17 provides that any violation of the provisions of § 14 constitutes a misdemeanor, punishable by fine or imprisonment. Section 18 provides that the use by a person of his name, in conjunction with the words "certified public accountant" or "public accountant" or any abbreviation thereof shall be prima facie evidence that such person "is holding himself out to be a certified public accountant or public accountant holding an enrollment certificate."

### (2)

Comprehensive Accounting Service Company (Comprehensive), a foreign corporation registered to do business in Maryland, does not hold an enrollment certificate to practice public accounting in Maryland. It nevertheless holds itself out to the public as "Accountants" and advertises that it provides "accounting" services. Specifically, it characterizes its services as "Bookkeeping, Accounting and Tax Records Services" and denominates itself on its business

letterhead as "Accountants." It claims a nationwide network of 150 authorized franchisees, staffed by qualified, graduate accountants who service 15,000 clients throughout the country. In its promotional literature, Comprehensive states that it was founded on the notion that "small and medium-sized business concerns cannot afford on their payroll the high-salaried accountants, systems specialists and consultants of huge corporations." Comprehensive advertises that it can provide "these same essential services to smaller businesses" and that it will "undertake *all* the bookkeeping, accounting, systems work, and permanent records for taxes for the business . . . ." (Emphasis in original.) The "basic services" which Comprehensive offers to the public include the preparation of profit and loss statements, "Bank Reconciliation" statements, complete records for tax purposes, the maintenance of detail general ledgers, and computerized accounts receivable systems, including all necessary journals.

Comprehensive claims that it has developed a specialized method of collecting, processing and disseminating financial information in order to furnish small business clients with monthly financial statements and a tax preparation service. Comprehensive's system is said to be based upon mass production "accounting" techniques, requiring mass media advertising to obtain large numbers of clients. Comprehensive does not represent that it conducts "audits" or "examinations," nor does it furnish written certificates or opinions concerning the correctness of financial statements, schedules, reports, or exhibits which it prepares.

### (3)

The Board filed a bill of complaint in the Circuit Court for Baltimore City to enjoin Comprehensive from violating the provisions of § 14 (e) by holding itself out to the public as "Accountants" and describing the services it offers as "Accounting" services. Comprehensive filed a combined demurrer and answer, in which it admitted offering "Accounting" services to the public and holding itself out as

"Accountants." Alleging that the services it performs for its clients are permissible under § 15 (e), Comprehensive claimed that § 14 (e) violated the due process clause of the fourteenth amendment and the free speech provisions of the first amendment because the statute restricted the dissemination of accurate commercial information to the public.

The trial court (Sullivan, J.) decided the case on the pleadings, without conducting an evidentiary hearing. It held that the challenged statute did not violate the due process clause of the fourteenth amendment because:

> "The use of the word 'accountant' by an uncertified person may deceive the public into believing that the person is certified by the state. Section 14 (e) . . . does not violate due process because the means selected has a real and substantial relation to the [public welfare] object sought to be obtained."

While concluding that a rational basis existed for the enactment of § 14 (e) — protection of the public from misleading and deceptive information — the court stated that nothing in the statute prevented Comprehensive "from offering the services it presently provides." The Board, it said, "has not attempted to stop . . . [Comprehensive] from practicing [its] livelihood, only from describing such as accounting services."

Addressing Comprehensive's first amendment claim, the court recognized that "prohibiting the use of the words 'accountant' and 'accounting' may infringe upon . . . [Comprehensive's] free speech." It observed, however, that "the right of free speech is not an unlimited, unqualified right, but the societal value of speech must on occasion be subordinated to other values and considerations." The court concluded that Comprehensive's right of free speech "can be limited so as not to mislead or deceive the public that . . . [it] has the qualifications of a certified corporation." The court said that nothing in the "commercial speech doctrine" inhibited the practice of a state's preventing false, misleading or deceptive information in the advertising of professional services. It, therefore, permanently enjoined Comprehensive

from describing its services as "accounting" or holding itself out to the public as an "accountant."

## (4)

Comprehensive contends that the statutory prohibition upon use of the words "accountant" and "accounting" to describe its services is unconstitutional, both facially and as applied. It argues that § 15 (e) permits uncertified accountants to perform any and all accounting work, other than the attest function. Consequently, it argues that the statute creates an anomaly of expressly authorizing an uncertified accountant to perform accounting services for the public while at the same time prohibiting him from describing those services as accounting, or holding himself out to the public as an accountant. As a result, advertising restrictions are imposed on Comprehensive which it claims will diminish and may entirely eliminate a class of competition inherently best suited to satisfy the accounting needs of small business clients, *i.e.,* accountants who do not hold enrollment certificates either as a certified public accountant or as a public accountant. It is the unlicensed accountant, according to Comprehensive, who is "the principal purveyor of accounting services for . . . small business clients."

With regard to its fourteenth amendment contention, Comprehensive claims that the prohibitions of § 14 (e) violate the due process clause because there is no rational basis from which it can be concluded that the use of the words "accountant" and "accounting" by uncertified practitioners would deceive the public into believing that they are certified or registered accountants.

Concerning its reliance on the first amendment, Comprehensive maintains that the prohibitions of § 14 (e) on its lawful accounting business unconstitutionally abridge its right of free speech because the statute prevents uncertified persons, who are permitted to perform ordinary accounting work, from advertising the true nature of their services; in other words, Comprehensive contends that the State cannot, consistent with the first amendment, completely suppress the

dissemination of truthful information about an entirely lawful business activity. Comprehensive argues that the burden is on the Board to demonstrate that § 14 (e) furthers a significant governmental interest and provides the least restrictive alternative of regulation; if it cannot do so, Comprehensive urges that the statute must be found to unconstitutionally infringe upon its first amendment right of free speech.

The Board takes a more simplistic view of the case. It argues that Comprehensive's admission that it performs accounting services and holds itself out to the public as an accountant, even though not holding an enrollment certificate, constitutes prima facie evidence under § 18 "that such person is holding himself out to be a certified public accountant or public accountant holding an enrollment certificate." The Board maintains that the rational basis underlying § 14 (e), consistent with due process requirements, is to prevent confusion and deception in the public mind between the practice of bookkeeping and the practice of accounting, even though it concedes there is some overlapping of the basic functions of each discipline. Through the operation of the statute the public is protected, according to the Board, from a non-certified practitioner's giving the appearance that he is certified or registered and thus subject to state and professional regulation and control.

As to Comprehensive's first amendment claim, the Board concedes that uncertified accountants "are free to engage in simple accounting work but are not allowed under § 14 (e) to borrow the title 'accountant' in describing themselves, or the word 'accounting' in describing their services." It claims that nothing in the statute restricts uncertified accountants from advertising the availability and terms of services they are allowed to perform, so long as they do not use the prohibited terms. While recognizing that the commercial speech doctrine serves to inform the public of the availability, nature and prices of products and services, the Board nevertheless contends that § 14 (e) does not prohibit the free flow of truthful commercial information in violation of the first

amendment, since it merely restricts the use of the words "accountant" and "accounting" by uncertified persons.

That only certified public accountants or public accountants holding enrollment certificates can engage in the practice of "public accounting" would seem plain from the literal words of the statute. Since that term is nowhere defined in Art. 75A, we think it manifest that the legislature intended that it be construed in accordance with its common meaning in the accounting field, as limited by the exceptions contained in § 15 (e). While these exceptions purport to be confined to "bookkeeping and tax services," the specifically delineated functions, as the Board admits, clearly encompass some accounting services, *i.e.,* "devising and installing systems, recording and presentation of financial information or data, preparing financial statements, schedules, reports and exhibits, or similar services . . . ." [1] Thus, § 15 (e) expressly authorizes an uncertified accountant to perform accounting services for the public, while at the same time § 14 (e) prohibits him from describing those services to the public as accounting, or holding himself out to the public as an accountant.

### (5)

The right of the State to regulate the practice of public accounting is well established, as is the power of the State to restrict the use of the words "certified public accountant," "public accountant," or the abbreviation "C.P.A." to those certified or registered by it. *See* 1 Am. Jur. 2d *Accountants* § 2 (1962). A statute prohibiting use of the term "accountant" by unregistered persons was held not violative of the due process clause in *Texas State Board of Public Accountancy v. Fulcher,* 515 S.W.2d 950 (Tex. Civ. App. 1974), since a reasonable relationship was found to exist between the prohibition and the state's goal of protecting the public.

---

1. Prior to its amendment by ch. 677 of the Acts of 1970, § 15 (e) listed "other accounting services" among those specified "bookkeeping and tax services" which uncertified persons were permitted to offer to the public. The term "other accounting services" was deleted by ch. 677 from § 15 (e); in its place the present words "similar services" were substituted.

Similarly, in *People v. Hill,* 66 Cal. App. 3d 320, 136 Cal. Rptr. 30 (Ct. App. 1977), it was held that the use of the terms "accounting" and "accountant" by a non-licensed accountant could be enjoined as misrepresentations, even though the statute did not expressly prohibit the use of those terms by an unlicensed person. On the other hand, it was held in *Florida Accountants Association v. Dandelake,* 98 So. 2d 323 (Fla. 1957), that it was an unreasonable restriction upon rights of contract to prohibit uncertified accountants from holding themselves out to the public as "accountants," so long as they did not use the statutory title of "certified public accountant" or any other designation that might mislead the public into believing they held a state certificate. *See also State v. Riedell,* 109 Okla. 35, 233 P. 684 (1924), holding that a statute which prohibits uncertified persons from practicing or holding themselves out as accountants constituted an unconstitutional abridgement of rights of contract and private property.

In *Pitts v. State Bd. of Examiners,* 222 Md. 224, 160 A. 2d 200 (1960), our predecessors noted that prohibiting the business use of specified titles or descriptions in the public interest by uncertified or unlicensed persons was a commonplace legislative device. In *Pitts,* a statute prohibited psychologists not certified by the Board from using the words "psychological," "psychologist" or "psychology" to describe the services they offered to the public. Although uncertified psychologists were permitted to practice, without regard to their competency, the Court said that the adequacy of the legislative scheme to protect the public was for the legislature to determine; and that the method chosen had a substantial relation to the evil sought to be remedied. It found no merit in the contention that the statutory prohibition constituted a denial of substantive due process because it protected the public against representations of competence implicit in the use of the term "psychologist" by uncertified psychologists.

Whether Comprehensive's right to substantive due process is offended by § 14 (e) depends, of course, upon the existence of a rational basis for the statute. One who attacks a statute on due process grounds bears the burden of proving the

absence of such a basis, viz., that it does not bear a real and substantial relationship to the governmental object sought to be attained. *Edgewood Nursing Home v. Maxwell,* 282 Md. 422, 384 A. 2d 748 (1978); *see Md. Bd. of Pharmacy v. Sav-A-Lot,* 270 Md. 103, 311 A. 2d 242 (1973); *Salisbury Beauty Schools v. St. Bd.,* 268 Md. 32, 300 A. 2d 367 (1973). Because no evidentiary hearing was held, Comprehensive was not afforded an opportunity — as it should have been — to undertake to prove the absence of a rational basis for § 14 (e) by showing that the public would not be deceived if it and other uncertified practitioners were permitted to refer to themselves as "Accountants." In view of our disposition of the case on first amendment grounds, however, such an evidentiary hearing will not be necessary.

Comprehensive's first amendment challenge to the prohibitions of § 14 (e) is grounded upon the fact, conceded by the Board, that § 15 (e) permits the performance of ordinary accounting work, without an enrollment certificate, so long as the practitioner does not represent "that an 'audit' or 'examination' has been made ... [and does not] furnish written certificates or opinions concerning the correctness, fairness or fair presentation of financial statements, schedules, reports, or exhibits ...."

Until recently, "commercial speech" claimed little of the protection traditionally afforded by the first amendment to other forms of speech. *See Valentine v. Chrestensen,* 316 U. S. 52, 62 S. Ct. 920, 86 L. Ed. 1262 (1942). However, beginning with *Bigelow v. Virginia,* 421 U. S. 809, 95 S. Ct. 2222, 44 L.Ed.2d 600 (1975), the Supreme Court has used a balancing test to determine whether commercial communications warrant first amendment protection. Applying this test to a statute prohibiting the publication of abortion advertisements, the Court held that the statute unconstitutionally infringed upon a newspaper publisher's first amendment rights. 421 U. S. at 829. While commenting that "[a]dvertising, like all public expression, may be subject to reasonable regulation that serves a legitimate public interest," 421 U. S. at 825-26, the Court concluded that the State's interest in shielding its citizens from abortion

advertisements was outweighed by the publisher's interest in communicating "factual matter of clear 'public interest.' " 421 U. S. at 822.

Constitutional protection for commercial speech was further expanded in *Va. Pharmacy Bd. v. Va. Consumer Council,* 425 U. S. 748, 96 S. Ct. 1817, 48 L.Ed.2d 346 (1976). In that case, the issue was "whether a State may completely suppress the dissemination of concededly truthful information about entirely lawful activity, fearful of that information's effect upon its disseminators and its recipients." 425 U. S. at 773. The Court decided that Virginia's ban on a pharmacist's commercial advertising of prescription drug prices interfered with the first amendment rights of consumers who wished to receive the information, as well as with the rights of those pharmacists who wished to speak. After examining and rejecting each of the State's proffered justifications for the law, the Court observed that:

> "The challenge now made, however, is based on the First Amendment. This casts the Board's justifications in a different light, for on close inspection it is seen that the State's protectiveness of its citizens rests in large measure on the advantages of their being kept in ignorance. The advertising ban does not directly affect professional standards one way or the other. It affects them only through the reactions it is assumed people will have to the free flow of drug price information. . . ." 425 U. S. at 769.

Characterizing the advertising ban as a "highly paternalistic approach," the Court determined that Virginia's goal of protecting the public from unscrupulous pharmacists could not be constitutionally achieved by legislation that kept the public in total ignorance of the prices of drugs. In reaching this conclusion the Court emphasized the interest of consumers in the free flow of truthful information necessary for formation of intelligent opinions and proper resource allocation. 425 U. S. at 764-65. Viewed in this light, the first amendment protects consumers' opportunities to choose for

themselves the price they are willing to pay for differing degrees of quality, service, or even safety. *See generally* Reich, *Consumer Protection and the First Amendment: A Dilemma for the FTC?,* 61 Minn. L. Rev. 705 (1977). Rather than totally suppressing truthful commercial information, the State must

> "assume that this information is not in itself harmful, that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them. If they are truly open, nothing prevents the 'professional' pharmacist from marketing his own assertedly superior product, and contrasting it with that of the low-cost, high-volume prescription drug retailer. But the choice among these alternative approaches is not ours to make or the Virginia General Assembly's. It is precisely this kind of choice, between the dangers of suppressing information, and the dangers of its misuse if it is freely available, that the First Amendment makes for us...." 425 U. S. at 770.

The Court was careful to distinguish truthful commercial speech from that which is false, misleading, or deceptive: "Untruthful speech, commercial or otherwise, has never been protected for its own sake." 425 U. S. at 771. Because commercial speech differs from other kinds of speech, in that it is more objectively verifiable and less likely to be chilled by regulations, commercial expression may enjoy a "different degree of protection" than that normally accorded under the first amendment. 425 U. S. at 771-72, n. 24. While invalidating Virginia's total ban on drug price advertising, the Court recognized that in some cases it may be "appropriate to require that a commercial message appear in such a form, or include such additional information, warnings, and disclaimers as are necessary to prevent its being deceptive." *Id. Cf. Fulcher v. Texas State Bd. of Public Acc.,* 571 S.W.2d 366, 370 (Tex. Civ. App. 1978) (dictum) (An uncertified

accountant's holding himself out as possessing expert knowledge in accounting is misleading and may be enjoined under *Virginia Pharmacy.*).

Nowhere, however, are the concepts "misleading" and "deceptive" defined in *Virginia Pharmacy.* Professor Pitofsky, in *Beyond Nader: Consumer Protection and the Regulation of Advertising,* 90 Harv. L. Rev. 661 (1977), points out that the Federal Trade Commission, in measuring deception and unfairness, looks at the total impression of the advertisement and determines the extent, if any, to which a substantial part of the audience might be misled by it. The meaning of an advertisement is a matter committed to the discretion of the Commission, and the FTC is not required to sample public opinion to determine its meaning. *Zenith Radio Corp. v. F.T.C.,* 143 F. 2d 29 (7th Cir. 1944). However, the discretion exercised by an agency or a legislature is not unreviewable by the courts, especially when the agency or legislative action results in the complete suppression of speech.

Although the Board recognizes that the Supreme Court has extended the guarantees of the first amendment to "commercial" speech, it asserts that the rationale of *Virginia Pharmacy* is inapplicable because § 14 (e) does not restrict uncertified accountants from advertising the availability and terms of the services they are allowed to offer under § 15 (e). A similar claim was made by the Federal Trade Commission in *Beneficial Corp. v. F.T.C.,* 542 F. 2d 611 (3d Cir. 1976), *cert. denied,* 430 U. S. 983 (1977), in attempting to justify an order which prohibited the use of the phrase "instant tax refund." Both the administrative law judge and the Commission concluded that only a total ban on the phrase could cure the false and misleading advertisements. On appeal, Beneficial contended that explanatory words could have cured any tendency to mislead, and that forcing it to abandon its copyrighted phrase was unwarranted. The court agreed. Relying on *Virginia Pharmacy,* it set aside the Commission's order, stating:

> "The Commission, like any governmental agency, must start from the premise that any prior restraint

is suspect, and that a remedy, even for deceptive advertising, can go no further than is necessary for the elimination of the deception. The Commission's order proscribing use of the term instant tax refund or any other word or words of similar import or meaning, without consideration of the context in which the words appear, went further than was permitted for that purpose and was an abuse of the Commission's remedial discretion. It cannot in that form and without such consideration be affirmed or enforced." 542 F. 2d at 620.

The court concluded that the Commission, in failing to "consider fully the feasibility of requiring merely that advertising copy be rewritten in lieu of total excision of the offending language," had exceeded its remedial authority. 542 F. 2d at 619. *Cf., U. S. v. National Soc. of Professional Engineers,* 555 F. 2d 978, 984 (D.C. Cir. 1977) *aff'd on other grounds,* 435 U. S. 679, 98 S. Ct. 1355, 55 L.Ed.2d 637 (1978) (striking down as overbroad an order requiring the Society to state that competitive bidding is not an unethical practice). Because the free flow of truthful information is protected by the first amendment, the courts require remedial relief for proved deceptions to be as narrow as possible. Similarly, the Supreme Court struck down a state ban on attorney advertising, and rejected the argument that all such advertising is inherently misleading. *See Bates v. State Bar of Arizona,* 433 U. S. 350, 384, 97 S. Ct. 2691, 53 L.Ed.2d 810 (1977), where the Court acknowledged that supplementation, such as a warning or disclaimer, might be necessary in some circumstances to assure that consumers are not misled, but held that advertising by attorneys may not be subjected to blanket suppression. *See also Carey v. Population Services Intern.,* 431 U. S. 678, 97 S. Ct. 2010, 52 L.Ed.2d 675 (1977) (A total prohibition on advertisement or display of contraceptives is unconstitutional.); *Linmark Assoc., Inc. v. Township of Willingboro,* 431 U. S. 85, 97 S. Ct. 1614, 52 L.Ed.2d 155 (1977) (Township's vital goal of promoting integrated housing does not justify banning "For Sale" signs, because of an unsubstantiated belief that the impact of these

signs might be detrimental. The ordinance was not shown to be necessary to achieve the township's goal.).

The Board's contention that § 14 (e) does not prevent Comprehensive from advertising the services it may legally offer is contradicted by the fact that Comprehensive, although permitted to engage in simple accounting services under the statute, has been enjoined from describing these services to the public as "accounting." To prevent the possibility of public confusion and deception, the legislature cannot consistent with the first amendment choose the most drastic remedy — the complete suppression of the use of certain words to describe the lawful activity of non-certified accountants. In these circumstances, § 14 (e)'s prohibition on a non-certified accountant's use of the words "accountant" and "accounting" is inconsistent with the rationale of *Virginia Pharmacy*. As there has been no showing by the State that a compelling need underlies the enactment of § 14 (e), that provision violates Comprehensive's first amendment free speech rights. Accordingly, the injunction issued against Comprehensive's holding itself out to the public as "accountant" and describing the services it performs as "accounting" must be dissolved.

*Decree reversed; costs to be paid by appellee.*