# EDWARD M. BARNETT v. MARYLAND STATE BOARD OF DENTAL EXAMINERS

[No. 122, September Term, 1981.]

*Decided May 5, 1982.*

362

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

*Donald A. Kaul,* with whom were *David J. Butler* and *Brownstein, Zeidman & Schomer, Paul H. Weinstein* and *Weinstein, Pitterich & Snedegar, P.C.* on the brief, for appellant.

*Nancy G. Frame, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellee.

Couch, J., delivered the opinion of the Court. Cole, J., dissents and filed a dissenting opinion at 383 *infra.*

This controversy began when the Maryland State Board of Dental Examiners (the Board) reprimanded the appellant, Edward M. Barnett, D.D.S., on September 10, 1980. It based its conclusion on the finding that his advertising tended to be deceptive or misleading, in violation of Maryland Code (1957, 1976 Repl. Vol.), Article 32, § 11 (k) (1).[1] Dr. Barnett appealed the Board's order to the Circuit Court for Montgomery County. That court (Sanders, J.) affirmed the Board's finding that Dr. Barnett was in violation of the statute, but reversed that part of the order concerning the reprimand. Dr. Barnett thereafter appealed the circuit court's

---

1. Art. 32, § 11, states:

"(a) Following a hearing as hereafter provided, the Board may revoke or suspend for such period as the Board in its sole discretion may determine, the license of any dentist licensed to practice in this State, or may refuse to restore or reinstate any suspended license of any dentist upon a finding by the Board that the dentist or former licensee whose license was revoked or suspended:

\* \* \*

(k) Has been found guilty of dishonorable or unprofessional conduct. Unprofessional conduct shall include but not be limited to the following:

(1) The obtaining of any fee by fraud; advertising to guarantee any dental service, or to perform any dental operation painlessly; making use of any *advertising statements of a character tending to deceive or mislead the public;* . . ."

The Board is also authorized to reprimand, as it did in this case, any dentist who violates this or any other provision of Art. 32. Code (1957, 1976 Repl. Vol.), Art. 32, § 35. Art. 32 was repealed by 1981 Md. Laws, ch. 8, § 1, and dentistry is now regulated by the Maryland Dentistry Act. *See* Code (1981), Health Occ. Art., tit. 4.

order to the Court of Special Appeals. We granted certiorari prior to consideration by that court, in order to consider important questions pertaining to the State's ability to regulate the advertising of professionals such as dentists.

## The Facts

The underlying facts of this dispute are not in controversy and may be summarized as follows. Dr. Barnett was a general practitioner of dentistry and was not engaged in the practice of any of the eight areas of dental specialties set out in § 5A of Article 32.[2] Appellant felt that the services he provided to his patients were more comprehensive than those provided by some other general dental practitioners and desired to communicate this to the public through the medium of advertising. Before doing so, however, in April, 1979, he communicated with the appellee, the Maryland State Dental Society, and the Southern Maryland Dental Society, Inc., seeking "the latest copy of the dental law and ethics as well as any opinions and guidelines that you may have as related to the entire dental practice art and ethics, and particularly in regard to advertising patents, copyrights, trademarks, and professional corporate names." These organizations promptly responded to Dr. Barnett whereby he learned that the advertising area was undergoing considerable study with rules and regulations in the process of being promulgated. Soon thereafter, in fur-

---

2. Code (1957, 1976 Repl. Vol., 1979 Cum. Supp.), Art. 32, § 5A (b) (repealed and now found in Code (1981), Health Occ. Art., § 4-503), states:

"The following branches of dentistry are established as suitable fields for specialized dental practice, to be known as 'specialties':

(1) Endodontics;
(2) Oral pathology;
(3) Oral surgery;
(4) Orthodontics;
(5) Pedodontics;
(6) Periodontics;
(7) Prosthodontics;
(8) Public health; and
(9) Any other field of specialized dental practice recognized and approved by the Board of Dental Examiners."

therance of his advertising plan, the appellant sought the advice of counsel and the Maryland Attorney General's office. He also filed an application to have the phrase "polydontics" registered as a service mark with the United States Patent and Trademark Office in May, 1979. Appellant's counsel, in August, 1979, advised him that he could go forward with his advertising, which he did.[3] Later that month, the Attorney General's office notified him that the Board believed that the use of the term "polydontics" was misleading. After the Board notified Dr. Barnett, in November, 1979, that he was to be charged with violating § 11 (k) (1), he made no further use of the phrase "polydontics" in his advertising. Nevertheless, the Board charged him with its violation. It held a hearing in April, 1980, and in September, 1980, found him guilty, meting out the sanction of reprimand. Thereafter, in October, 1981, "polydontics" was approved as a registered service mark by the Patent and Trademark Office.

On appeal the appellant presents three questions as follows:

"1. Where the only evidence before the Board and the lower court was the advertisements themselves, and where no consumer survey or public opinion evidence was presented, has the Board met the burden of proving that Dr. Barnett's advertisements were 'deceptive and misleading to the public?'

2. Where the term POLYDONTICS has been federally registered as a service mark under the Lanham Act, thereby conclusively establishing that it is non-deceptive, can the Board acting under color of state authority ban the use of that federal service mark?

---

3. The advertisements at issue are three in number and were circulated in three different ways. One was a circular; how it was circulated does not appear in the record. The second was a flier, circulated with others, apparently door-to-door, in a "Val-Pak." The third was an advertisement in the *Washington Post* which appeared on September 18, 1979. They are set out in appendices A, B, and C, respectively.

3. Does the Board's action barring Dr. Barnett from publishing his advertisements constitute a violation of his First Amendment commercial speech rights?"

We shall consider these questions, although not in the order presented by the appellant.

# I

## *Free Speech*

Dr. Barnett contends that the Board's action denied him his First Amendment right of free speech. *See U.S. Const.* amends. I and XIV. The Supreme Court, in *Virginia Pharmacy Board v. Virginia Citizens Consumer Council,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), made it clear that the right of free speech includes truthful commercial speech and held that the right to advertise the prescription drug prices at issue there was protected by that right. A year later, the Court held that the truthful advertising of prices at which routine legal services could be performed was also protected by the First Amendment. *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). Despite the protections accorded the speech involved in these and succeeding cases, the Court has made it clear that

"The First Amendment's concern for commercial speech is based on the informational function of advertising. . . . Consequently, there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity. The government may ban forms of communication more likely to deceive the public than to inform it. . . ." *Central Hudson Gas v. Public Service Commission,* 447 U.S. 557, 563, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341, 349 (1980) (citation omitted).

The Supreme Court has made it abundantly clear that a

state may place a total prohibition on deceptive or misleading commercial speech:

> "Commercial speech doctrine, in the context of advertising for professional services, may be summarized generally as follows: Truthful advertising related to lawful activities is entitled to the protections of the First Amendment. But when the particular content or method of the advertising suggests that it is inherently misleading or when experience has proven that in fact such advertising is subject to abuse, the states may impose appropriate restrictions. *Misleading advertising may be prohibited entirely." In re R — M.J. —, U.S.* , 102 S.Ct. 929, 937, 71 L.Ed.2d 64, 74 (1982) (emphasis added).

Dr. Barnett has neither alleged, nor could we find on these facts, that the speech in question is anything but commercial in character. He " 'does not wish to editorialize on any subject, cultural, philosophical, or political. He does not wish to report any particularly newsworthy fact, or to make generalized observations even about commercial matters.' " *Friedman v. Rogers,* 440 U.S. 1, 11, 99 S.Ct. 887, 895, 59 L.Ed.2d 100, 111 (1979), *quoting Virginia Pharmacy,* 425 U.S. at 761, 96 S.Ct. at 1825, 48 L.Ed.2d at 358. Thus, if the speech at issue, Dr. Barnett's advertising, is misleading or deceptive, there is no constitutional protection for it and the State may ban it, as it effectively has, through the Board's action.

Dr. Barnett further argues that "even if Appellant's [service] mark were deceptive, the Board's total ban on its use goes further than necessary to eliminate any alleged deception." In support of this argument, he cites *Beneficial Corp. v. FTC,* 542 F.2d 611 (3d Cir. 1976), *cert. denied,* 430 U.S. 983 (1977) and *Comprehensive Accounting v. Maryland State Board,* 284 Md. 474, 397 A.2d 1019 (1979) (discussing *Beneficial*).

Appellant either does not understand the Board's decision or misstates his argument. The Board found that the three

advertisements were deceptive and misleading; it did not intimate that any future advertisements containing the word "polydontics" would *ipso facto* be found misleading.[4] Therefore, the Board's action was not a "total ban on its use" as appellant asserts.

The two cases cited by Dr. Barnett, *Beneficial* and *Comprehensive Accounting,* were concerned with prior restraint of commercial speech by the State, rather than an after-the-fact determination that the speech was deceptive and misleading. In *Beneficial,* the FTC ordered Beneficial to refrain from any *future* use of the terms "Instant Tax Refund Loan" or "Instant Tax Refund Plan" because it asserted that the public would believe that the loans could be obtained solely on the basis of an anticipated tax refund due from the government when Beneficial actually required the same credit-worthiness to be shown as in any other loan. 542 F.2d at 613-614, 617. The third circuit court of appeals held that this prior restraint was invalid because it was not shown that these terms would always be deceptive and misleading. *Id.* at 618-620. A modification of the advertisement could cure the misleading effect. *Id.* at 619.

In *Comprehensive Accounting,* we held that the legislature's statutory prohibition of the use of the word "accountant," by one who was not a certified public accountant, was a violation of the First Amendment right of free speech. We stated that "the legislature cannot consistent with the first amendment choose the most drastic remedy — the complete suppression of the use of certain words to describe the lawful activity of non-certified accountants." 284 Md. at 489, 397 A.2d at 1027.

Both *Beneficial* and *Comprehensive Accounting* are consistent with the general rule that the State must use the least restrictive means available when placing a prior restraint on the right of free speech. *See Central Hudson Gas v. Public Service Commission,* 447 U.S. at 571-72, 100 S.Ct. at 2354, 65 L.Ed.2d at 354. Each of these cases involved the

---

**4.** Senate Bill 342, enacted by the 1982 Maryland legislature, but as yet unsigned by the governor, authorizes a dentist to practice under a trade name providing, *inter alia,* that it is not deceptive or misleading.

suppression of future speech. The case *sub judice* does not involve future suppression, rather, it involves a determination of whether past speech was deceptive and misleading. The only prior restraint involved in Dr. Barnett's case, the constitutionality of which he does not attack, is the § 11 (k) (1) prohibition against deceptive or misleading advertising. By arguing that the Board's action "goes further than necessary to eliminate any alleged deception," Dr. Barnett seems to be contending that the Board did not use the least restrictive means in making its determination, implying perhaps that the Board must rewrite Dr. Barnett's advertising copy so that it is not misleading before it can find him guilty of violating § 11 (k) (1). We do not believe this is the duty or proper function of the Board.

## II

### Sufficiency of the Evidence

Dr. Barnett asserts that, because the only evidence before the Board was the three advertisements themselves, it lacked sufficient evidence to find that the advertisements were misleading or deceptive. This argument is based on several grounds. Before considering this issue, we will state the appropriate standard of review we must use in reviewing the Board's finding of fact that the advertisements were misleading.[5]

---

5. While the Board did not list as one of its four findings of fact that it found that the advertisements were misleading, it must have implicitly done so in order to reach its fifth conclusion of law, "That the Respondent is GUILTY of violation of Article 32, § 11 (k) (1). . . ."

The factual findings of the Board are as follows:

"1. 'Polydontics' is not a recognized specialty in dentistry.

2. Many of the recognized specialties in dentistry end with the suffix 'dontics'.

3. Polydontia is defined in Butterworth's Medical Dictionary, British Medical Dictionary, MacMillan Medical Dictionary and the Gould Medical Dictionary as 'the presence of more than the usual number of teeth'.

4. Respondent advertised in fliers. circulars and newspapers in 1979 using the term 'polydontics' to describe the dental services he offers."

The Board of Dental Examiners is created by § 2 of Article 32. It may, after a hearing,

> "revoke or suspend . . . the license of any dentist licensed to practice in this State . . . upon a finding by the Board that the dentist . . . [h]as been found guilty of dishonorable or unprofessional conduct [which includes] . . . making use of any advertising statements of a character tending to deceive or mislead the public [.]" Code (1957, 1976 Repl. Vol.), Article 32, § 11 (a), (k), and (k) (1).[6]

This Court will not substitute its judgment for that of the Board, an administrative agency whose powers are delegated to it by the legislature, where the issue is fairly debatable and the record contains substantial evidence supporting the administrative determination. *E.g., Annapolis v. Annapolis Waterfront Co.,* 284 Md. 383, 395, 396 A.2d 1080, 1087 (1979). The test for reviewing the factual findings of administrative agencies is that of "substantial evidence." *Department of Natural Resources v. Linchester,* 274 Md. 211, 334 A.2d 514 (1975). That test "has been defined as 'such relevant evidence as a reasonable man might accept as adequate to support a conclusion. . . .' " *Bulluck v. Pelham Wood Apartments,* 283 Md. 505, 512, 390 A.2d 1119, 1123 (1978). The Board's finding of fact, that the advertisements were misleading, meets that test.

That finding was based on the presence of the word "polydontics" in the advertisements. The Board found that five of the eight specialties listed in Article 32, § 5A, ended with the suffix "-dontics." See note 5, *supra*. We think that that similarity, especially when combined with the legends in the advertisements explaining the word "polydontics," could convince a reasonable person that the advertisements were misleading because of the possibility that a lay person would conclude that "polydontics" was a dental specialty and that Dr. Barnett possessed some special expertise not held

---

**6.** The Board may also reprimand, as it did in this case, a dentist who violates this or any other provision of Art. 32. *See* Code (1957, 1976 Repl. Vol.), Art. 32, § 35 (now found in Code (1981), Health Occ. Art., § 4-314.)

by most general practitioners. We note that the dictionary definition of the five specialties ending with the suffix "-dontics" all begin with the phrase, "a branch of dentistry dealing with ..." or "the dental specialty concerned with...."[7] The Board included in its findings of fact that "Polydontia is defined in Butterworth's Medical Dictionary, British Medical Dictionary, MacMillan Medical Dictionary, and the Gould Medical Dictionary as 'the presence of more than the usual number of teeth.'" This similarity to other dental specialties certainly would support a reasonable person's conclusion that the advertisements were misleading.

Dr. Barnett contends that the legends in the advertisements explaining the word "polydontics" cure any tendency to mislead. Each advertisement's legend is slightly different. The first states that "polydontics" is "A word we created for the Individualized, Comprehensive, Preventive, and Corrective care for adults and children in all areas of general dentistry...." See appendix A. The second states that it is "A word we created for comprehensive care of the patient with multiple dental problems." See appendix B. The third states that it is "A word that we have created to stand for individualized care, diagnostic, therapeutic and preventive for the patient with multiple kinds of dental problems." See appendix C. We think that not only do these legends fail to cure the misleading effect of the word "polydontics" (i.e., a reasonable person could still find the advertisements misleading), but that, to the contrary, they would support a reasonable person's conclusion that Dr. Barnett was practicing in the dental specialty of the

---

7. Webster's Third New International Dictionary (1976) defines *endodontics* as *endodontia,* which is defined as "a branch of dentistry concerned with the diagnosis and treatment of diseases of the pulp [,]" *id.* at 749; *orthodontics* as "a branch of dentistry that deals with irregularities of the teeth and abnormalities of their relations with surrounding parts and with the correction of these esp. by means of braces and mechanical aids [,]" *id.* at 1594; *pedodontics* as "a branch of dentistry that is concerned with the dental care of children [,]" *id.* at 1665; *periodontics* as "a branch of dentistry that is concerned with diseases of the supporting structures of the teeth [,]" *id.* at 1681; and *prosthodontics* as "the dental specialty concerned with the making of artificial replacements of missing parts of the mouth and jaws [,]" *id.* at 1882.

treatment of patients who had many different kinds of dental problems.

Dr. Barnett urges that the Board is "oversensitive to words that sound like dental specialties, in a way that an ordinary consumer might not be." In support of this contention he cites *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). In that case the Arizona Bar's Board of Governors imposed sanctions on two attorneys for advertising their services, in violation of its disciplinary rules. One of the grounds upon which the decision was based was that the "advertisement . . . [made] reference to a 'legal clinic,' an allegedly undefined term. . . ." *Id.* at 381. The Supreme Court held that, "We suspect that the public would readily understand the term 'legal clinic' — if, indeed, it focused on the term at all — to refer to an operation like that of appellants' that is geared to provide standardized and multiple services." *Id.*

We do not think the situation in *Bates* and the situation here are analogous. "Polydontics" is not a word of ordinary usage, as is "clinic," and we do not think that the connotations of the two words are similar, such that the public would readily understand the word "polydontics," even with the explanatory legend attached, as an invented service mark with no claim of special expertise, as the court thought the public would understand "clinic...to refer to an operation like that of appellants' that is geared to provide standardized and multiple services." *Id.* Dr. Barnett's argument would analogous to the one he cites in *Bates* if he had advertised that he operated a dental clinic.

Dr. Barnett's assertion in his brief, that the rationale underlying *Bates* was that, "The Court would not permit the State Bar's disguised disapproval for the nature of the legal services rendered by Bates and his colleague to be manifested in censorship of their advertisements", is unfounded and no support for it can be found in the language of the Supreme Court's opinion. His conclusion, that "this Court should consider whether it may be distrust for the novel concept of delivery of general dentistry services that underlies the Board's finding [that the advertisements were

misleading]," is likewise unfounded and without support in the record.

In support of his argument that the Board lacked sufficient evidence to find the advertisements misleading, Dr. Barnett argues that the Board's finding was required, as a matter of law, to be supported by evidence of consumer reaction to the advertisements, such as marketing surveys. He cites to us *American Brands, Inc. v. R. J. Reynolds Tobacco Co.*, 413 F.Supp. 1352 (S.D.N.Y. 1976), quoted in *American Home Products Corp. v. Johnson & Johnson*, 577 F.2d 160, 165-66 (2d Cir. 1978) and *McNeilab, Inc. v. American Home Products Corp.*, 501 F.Supp. 517, 524-25 (S.D.N.Y. 1980), in which evidence of consumer surveys was admitted to prove that advertisements were in violation of § 43 (a) of the Lanham Act, *see* 15 U.S.C. § 1125 (a) (1970), which establishes federal civil liability for false advertising. These cases are distinguishable from the one at bar.

In *American Brands*, on which *American Home* and *McNeilab* rely, American alleged that Reynolds' advertising was deceptive and in violation of § 43 (a) of the Lanham Act. American alleged that (1) Reynolds advertised that a Reynolds' product had the "lowest" tar of any cigarette, (2) that American's product had an equally low amount of tar, (3) that the advertisement would cause consumers to think that no other cigarette had as little tar as the Reynolds product, and, therefore, the advertisement was deceptive. The Court stated,

> "Deceptive advertising or merchandising statements may be judged in various ways. If a statement is actually false, relief can be granted on the court's own findings without reference to the reaction of the buyer or consumer of the product. Again, even where the defendant's trademark or trade name does not actually duplicate the plaintiff's, *if there is such a substantial similarity between the plaintiff's mark or name and the defendant's that the likelihood of confusion must necessarily follow, a court can grant relief on its*

*own findings without recourse to a survey of consumer reaction.*

The subject matter here is different. We are dealing not with statements which are literally or grammatically untrue; *and the tendency to deceive alleged here does not arise out of possible confusion of one product with another.* Rather, we are asked to determine whether a statement acknowledged to be literally true and grammatically correct nevertheless has a tendency to mislead, confuse or deceive. As to such a proposition 'the public's reaction to (the) advertisement will be the starting point in any discussion of the likelihood of deception. . . . If an advertisement is designed to impress . . . customers, . . . the reaction of (that) group [ ] will be determinative.' 1 Callman: Unfair Competition, Trademarks & Monopolies at § 19.2 (a) (1) (3rd ed.1967). A court may, of course, construe and parse the language of the advertisement. It may have personal reactions as to the defensibility or indefensibility of the deliberately manipulated words. It may conclude that the language is far from candid and would never pass muster under tests otherwise applied–for example, the Securities Acts' injunction that 'thou shalt disclose'; but the court's reaction is at best not determinative and at worst irrelevant. The question in such cases is—what does the person to whom the advertisement is addressed find to be the message?" *American Brands,* 413 F.Supp. at 1356-57 (emphasis added).

Thus, the Court held that, in determining whether § 43 (a) had been violated, it could conclude whether the advertising was deceptive without evidence of consumer surveys if (1) the statement is actually false, or (2) there is a substantial similarity between the plaintiff's trademark or name and the defendant's which would result in a likelihood of confusion. In the third case, however, where the issue is whether an advertising statement, acknowledged to be

literally true and grammatically correct, still had a tendency to mislead consumers, evidence of consumer reaction would be required.

We think that the facts in the case *sub judice* are most analogous to the second case where a defendant's trade name is substantially similar to the plaintiff's, and, therefore, even under the *American Brands* rationale, a court would not need to have evidence of consumer surveys before it to find the advertising misleading. This is a case where the tendency to deceive arises out of the possible confusion of one type of service with another, *i.e.,* the practice of general dentistry versus the practice of specialized dentistry. Just as one trade name may be misleading because it is substantially similar to another, the Board found that "polydontics" was misleading because it was substantially similar to several recognized dental specialties. This is not analogous to the third case where the advertising statement at issue, "polydontics," is acknowledged to be literally true and grammatically correct, yet is still alleged to have a tendency to deceive. As a word invented by Dr. Barnett, "polydontics" lacks the capacity to be either factually true or false; it is neither a true nor a false statement.

Moreover, *American Home, American Tobacco,* and *McNeilab* were cases in which one competitor sued another. The issue was whether one competitor's advertising was deceptive or misleading, and, if so, whether it caused damage to the other competitor. These cases did not involve state regulation of licensed professions. The Supreme Court has stated that the states bear "a special responsibility for maintaining standards among members of the licensed professions." *Ohralik v. Ohio State Bar Association,* 436 U.S. 447, 460, 98 S.Ct. 1912, 1920, 56 L.Ed.2d 444, 456 (1978). In *Ohralik,* an attorney was disciplined for soliciting clients in violation of the state's disciplinary rules. The Court held that the prohibition against solicitation did not violate the attorney's first and fourteenth amendment rights and that it was unnecessary for the state to prove that a specific individual had been harmed. *Id.* at 468. Similarly, we do not think that the state must prove by consumer sur-

veys that a specific consumer has been misled or deceived by Dr. Barnett's advertising.

The appellant's argument that the Board based its decision solely on the word "polydontics" is likewise unconvincing. The Board received into evidence copies of the advertisements at issue. The fact that it found the word "polydontics" deceptive and misleading is sufficient to support its finding that Dr. Barnett violated § 11 (k) (1), unless the advertisement, read as a whole, could not support the conclusion of a reasonable person that the advertisement was misleading. As we have indicated, there is nothing in the advertising that would cure its tendency to mislead, such that a reasonable person could not find it misleading.

We also find unconvincing the argument that the Board "focused on its own 'technical interpretation' of a single word appearing in the ads, while totally ignoring the other 70, 80, or 100 words . . . which include the legend clearly explaining what the word POLYDONTICS means." Had the Board relied on a technical interpretation it would have concluded that "polydontics" meant the branch of dentistry concerned with the diagnosis and treatment of the condition of more than the usual number of teeth in the mouth because it found that polydontia was defined in medical dictionaries as " 'the presence of more than the usual number of teeth.' " See note 5, *supra.*

We believe that the three advertisements in evidence before the Board constituted sufficient evidence for a reasonable person to conclude that the advertisements were deceptive and misleading. Accordingly, the circuit court could not substitute its judgment for that of the Board, and did not do so.

### Federal Preemption

Dr. Barnett's final argument is that the Board's action is preempted by federal trademark law, 15 U.S.C. § 1051 (1970), *et seq.,* because "polydontics" was registered as a service mark on October 27, 1981. He argues that the

Board's action challenged the validity of the registration and interfered with Dr. Barnett's federal right to use the service mark in his advertising.

While the Supremacy Clause of the United States Constitution, U.S. Const. Art. VI, cl. 2, mandates that federal law is paramount over conflicting state law, *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1 (1824), state law

" 'should be preempted . . . "only to the extent necessary to protect the achievement of the aims of " ' the federal law, since 'the proper approach is to reconcile "the operation of both statutory schemes with one another rather than holding [the state scheme] completely ousted." ' *Merrill Lynch, Pierce, Fenner, & Smith v. Ware,* 414 U.S. 117, 127 (1973) quoting *Silver v. New York Stock Exchange,* 373 U.S. 341, 361, 357 (1963)." *DeCanas v. Bica,* 424 U.S. 351, 358, 96 S.Ct. 933, 937, 47 L.Ed.2d 43, 50, n.5 (1976) (brackets in original).

The question that courts must answer in determining whether preemption applies is whether the purposes of the statutes conflict.

"Often Congress does not clearly state in its legislation whether it intends to pre-empt state laws; and in such instances, the courts normally sustain local regulation of the same subject matter unless it conflicts with federal law or would frustrate the federal scheme, or unless the courts discern from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the States. *Ray v. Atlantic Richfield Co.,* [435 U.S. 151,] 157-158 [1978]; *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 540-541 (1977); *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947)." *Malone v. White Motor Corp.,* 435 U.S. 497, 504, 98 S.Ct. 1185, 1190, 55 L.Ed.2d 443, 450 (1978).

"Pre-emption of state law by federal statute or regulation is not favored 'in the absence of persuasive reasons — either that the nature of the

regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained.' *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142 (1963).

\* \* \*

The doctrine does not and could not in our federal system withdraw from the States either the 'power to regulate where the activity regulated [is] a merely peripheral concern' of federal law, *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 243 (1959), or the authority to legislate when Congress could have regulated 'a distinctive part of a subject which is peculiarly adapted to local regulation . . . but did not,' *Hines v. Davidowitz,* 312 U.S. 52, 68, n.22 (1941)." *Chicago & North Western Transportation Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 317, 101 S.Ct. 1124, 1130, 67 L.Ed.2d 258, 264-65 (1981).

One of the purposes of the Lanham Act is to protect the registrant of the mark against infringements and unfair competition. *See* 15 U.S.C. § 1127 (1970). That section states, in pertinent part, "The intent of this chapter is . . . to protect persons engaged in [commerce within the control of Congress] against unfair competition . . . ." *Id.*

"Congress' purpose in enacting § 43 (a) was to create a special and limited unfair competition remedy, virtually without regard for the interests of consumers generally and almost certainly without any consideration of consumer rights of action in particular. The Act's purpose, as defined in § 45 [15 U.S.C. § 1127], is exclusively to protect the interests of a purely commercial class against unscrupulous commercial conduct." *Colligan v. Activities Club of New York, Ltd.,* 442 F.2d 686, 692 (2d Cir.) (footnotes omitted), *cert. denied,* 404 U.S. 1004 (1971).

The purpose of § 11 (k) (1) is to protect consumers of dental

services against deceptive or misleading dental advertising. Therefore, the purposes of the two statutory schemes do not conflict. "The Supremacy Clause bars only state statutes or doctrine that would permit the sort of confusing or deceptive practices the draftsmen of the Lanham Act sought to prevent." *Keebler Co. v. Rovira Biscuit Corp.,* 624 F.2d 366, 372, n.3 (1st Cir. 1980). We do not think that Congress, in enacting a statutory scheme to protect trademarks, meant to preempt the entire field of the regulation of deceptive advertising as it applies to trademarks. "[Section 43 (a)] is cumulative of, and does not preempt, the broader consumer-oriented remedies provided by the common law of unfair competition." *Id.* at 373. If we are incorrect, then the Supreme Court's holding in *Friedman v. Rogers,* 440 U.S. 1, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979), that a state may constitutionally prohibit the use of trade names by opticians because of their potential to mislead or deceive, can be circumvented by registering the service mark with the Patent and Trademark Office. Similar reasoning would add to the Court's caveats in *Virginia Pharmacy,* 425 U.S. at 771-72, 96 S.Ct. at 1830-31, 48 L.Ed.2d at 364-65 and *Bates,* 433 U.S. at 383, 97 S.Ct. at 2708-09, 53 L.Ed.2d at 835 (that states may still prohibit deceptive or misleading advertising), the exception: "unless the advertising at issue is a registered trademark." We think it obvious that such results were not intended. If this were not true, all common law unfair competition involving trademarks would also be preempted. A state's determination that the use of a trademark in advertising is deceptive does not frustrate the purposes of the Lanham Act.

In *Hearing Aid Association of Kentucky, Inc. v. Bullock,* 413 F.Supp. 1032, 1037 (E.D.Ky. 1976), the court dismissed the case for reasons of federal-state comity because the same case was pending in a state court. It noted, however, in dictum, that the courts have allowed the FTC and other federal agencies to regulate the use of trademarks in commerce where their use has been deceptive or misleading. "Since the registration of the trademark does not give the registrant an absolute right to its use, it is reasonable to

assume that states may regulate the use of fraudulent or deceptive terms in the same manner as do federal agencies." *Id.* at 1037-38. The appellant ignores the distinction between (1) protecting the registrant's exclusive use of a trademark vis-a-vis its use by competitors, and (2) prohibiting its use by *anyone* because of its tendency to mislead or deceive.

> *Judgment of the Circuit Court affirmed.*
> *Costs to be paid by appellant.*

APPENDIX A

## EDWARD M. BARNETT, D.D.S.

Dedicated To Patients Who Want Attractive Smiles, Fresh Breath
And A Healthy Mouth At Reasonable Costs

### GENERAL PRACTICE WHICH INCLUDES

 POLYDONTICS\* T.M.

A word we created for Individualized, Comprehensive, Preventive and Corrective care for adults and children in all areas of general dentistry, namely:

| | | |
|---|---|---|
| al Exams Cleanings & | Gum Work | Fixed Bridgework |
| Preventive Dentistry | Root Canal Work | Removable Dentures |
| ings & Crowns | Extractions & implants | Braces and Bite Correction |

### ONE VISIT TREATMENT & GENERAL ANALGESIA
### AVAILABLE WHEN APPROPRIATE

THE DENTAL BUILDING
10611 New Hampshire Ave.
Silver Spring, Md. 20903

Conveniently located on New Hampshire Avenue ½ mile North of Beltway Exit 25

Established 1957
© Copyright 1979

## 434-8982

382

---

### EDWARD M. BARNETT, D.D.S.
DEDICATED TO PATIENTS WHO WANT BEAUTIFUL SMILES AND CLEAN FRESH
BREATH AND WHO WANT TO SAVE THEIR TEETH, TIME AND MONEY.
GENERAL PRACTICE WHICH INCLUDES

## POLYDONTICS*

*A WORD WE CREATED FOR COMPREHENSIVE CARE OF THE PATIENT WITH MULTIPLE DENTAL PROBLEM

*ONE VISIT TREATMENT AND GENERAL ANALGESIA AVAILABLE WHEN APPROPRIA*

**434-8982**

ESTABLISHED 1957    ©COPYRIGHT 1979

**THE DENTAL BUILDING**
10611 N.W. AVENUE
SILVER SPRING, MARYLAND 20903
(½ MILE NORTH OF BELTWAY)

INITIAL EXAM AND
CONSULTATION $18.00
WITH THIS CERTIFICATE

Val-Pak of Maryland, No. 17283

## APPENDIX C

Edward M  Barnett.D.D S.
General Practice which includes

# POLYDONTICS.*

*A word that we have created to stand for
individualized care. diagnostic, therapeutic and
preventative for the patient with multiple kinds
of dental problems.

One Visit Treatment and General Analgesia
Available When Appropriate

INITIAL EXAM AND CONSULTATION - $37

Ma or Credit Cards and
Dental insurance Accepted

Partic pant: Denta  Blue Cross-
Blue Shield. Md. and D.C.

434-8982
Estab. 1957 • 1979

THE DENTAL BUILDING
10611 N H. Avenue
Silver Spring, Md. 20903

COLE, J., *dissenting:*

I do not believe Dr. Barnett's advertisement is misleading or deceptive, nor do I find any evidence in the record to support the majority's conclusion that it is deceptive. I would hold the advertisement entitled to First Amendment protection. I, therefore, dissent.

It seems plain to me that if the public reads the entire advertisement, it will realize that this is a professional who has coined a word to attract persons to his office where they may receive the services of one engaged in the general practice of dentistry with emphasis on certain named treatments, none of which encroaches upon a dental specialty.