STELLA DONOVAN *v.* HELEN SCUDERI and FRANK
MIKUS, Co-Personal Representatives of the Estate
of Alfred C. Scuderi

[No. 929, September Term, 1981.]

*Decided March 8, 1982.*

The cause was argued before Lowe and Wilner, JJ., and Charles E. Orth, Jr., Associate Judge of the Court of Appeals (retired), specially assigned.

*Mark A. Winkler,* with whom was *Donald E. Sinrod* on the brief, for appellant.

*Thomas B. Yewell,* with whom was *A. Lee Haislip, Jr.,* on the brief, for appellees.

Lowe, J., delivered the opinion of the Court. Wilner, J., filed a concurring opinion at page 228 *infra.*

To the extent that "morality consists of suspecting other people of not being married", as defined by George Bernard Shaw, the virtues of each generation lie in the interpretation of the times. Conjugal relationships, absent the requisite incantations of clerk or priest, are probably no more frequent in this generation than in any other, only more notorious. The morality of such a relationship depends as much upon the customs of the country as it does upon the current feeling of one's peers. Unashamed and unabashed companions of convenience are encouraged to avoid sanctifying their relationships today both by tax burdens extracted and benefits provided through the public policy of government. Judge-made law resting upon public policy of one generation, like that more properly legislated, may not, under changed conditions be the public policy of another.[1] But some are caught in the transition from the older common law moral concept of meretricious misconduct espoused by judi-

---

* Note: *Certiorari* denied, Court of Appeals of Maryland, June 28, 1982.

**1.** Patton v. United States, 281 U.S. 276, 306 (1930), quoted and followed in Adler v. American Standard Corp., 291 Md. 31, 45-46 (1981).

cial angels who themselves, in most instances, lived like men.

*Baxter v. Wilburn,* 172 Md. 160 (1937), adopted for Maryland the common law principle that contracts based upon the consideration, either past or future, of illicit sexual intercourse, or stipulation for such future intercourse, or promoting or furnishing opportunity for unlawful cohabitation, are void and unenforceable in equity. The mere fact that a man and a woman are living together in an unlawful relation does not, however, disable them from making an enforceable contract with each other, if it has no reference to continuation of the relation, or is only incidentally connected with it, and may be supported independently of it. A loan from one party to the other to buy clothes, for example, would be lawful, and upon the same reasoning a loan to buy real property not for the furtherance of the immoral relation would be enforceable. *Id.* at 162-163.

Stella Donovan (appellant here) probably did not know, nor would she have cared that the law was such as described by Chief Judge Bond in *Baxter v. Wilburn* when she began "both a business and a personal relationship" with Alfred C. Scuderi. That relationship (described by a witness at the hearing below as "a loving one") was, according to the Orphans' Court for Prince George's County, inferentially meretricious because Ms. Donovan's daughter conceded that her mother and Mr. Scuderi were lovers, and Ms. Donovan's friend described the pair's frequent and mutual "use" of an apartment Donovan had obtained at Scuderi's request. Although Ms. Donovan testified, she was not asked about the relationship. Since Mr. Scuderi died four years after commencing that relationship, neither party to the agreement could testify regarding it because of Maryland's dead man's statute. Md. Cts. & Jud. Proc. Code Ann. (1980 Repl. Vol.), § 9-116. The court was compelled to piece the puzzle together from the observations of friends and relatives who testified not only to what they saw and heard, but, in questionably admissible testimony, to their own opinions as to what they surmised had occurred as a result of the

personal "aspect" of the relationship. *See Lynch v. Rogers,* 177 Md. 478, 487 (1940).

On cross-examination, the appellees' attorney drew a grudging concession from one of appellant's witnesses when he asked:

> "Actually that was a sexual relationship, wasn't it?"

"Umm" replied the witness, whose foundation for that conclusion appeared purely speculative and "neither material nor relevant," since she did not testify to any knowledge, nor did she profess to *know,* that there was anything immoral in their conduct. *Lynch v. Rogers, supra* at 487. To the contrary, the witness vehemently denied that she considered the relationship "illicit," despite the knowledge that Mr. Scuderi was a married man.

The business part of the relationship was clearly established by proof of expenditures and services provided at Mr. Scuderi's request by Ms. Donovan for Mr. Scuderi, including "catering services, personal shopping services (clothing, furniture and furnishings)," and loans, portraits, and sculptures, all amounting to some $60,000. These provisions were predicated upon Mr. Scuderi's promise to repay her with 1000 shares of stock of the bank of which he was chairman of the board. The Orphans' Court for Prince George's County, from which this case emanated, found that such a contract existed. That aspect of the case was uncontradicted.

> "In this case there was testimony by competent third party witnesses of an express contract to pay a definite sum to wit: 1000 shares of the stock of Peoples Security Bank and because I am convinced by their testimony at this juncture I find as a fact that such a contract did exist as expressed by the decedent to these witnesses which was not contradicted or disputed. Furthermore, I am also satisfied based upon the evidence produced that the services represented by claimant's Exhibits 1-51 were in fact

performed and the expenditures documented thereby made on behalf of the decedent and that he received substantial benefit therefrom."

The court, however, declined to require the estate to honor the claim it had acknowledged as due because it found that:

"The decedent himself stated it most succinctly when he said of the claimant 'who he loved and who loved him so much that she would buy him things' and that he would repay her. There is no way to conclude from this that either the expenditures made on behalf of the decedent or the services rendered to him by the claimant as well as the promise of the decedent to repay her were made for any reason other than the promotion of their meretricious relationship."

Because *Baxter v. Wilburn* remains the law unless and until changed by the Legislature or the Court of Appeals (*see Hans v. Franklin Square Hosp.*, 29 Md. App. 329, 335 (1975), *cert. denied,* 276 Md. 744 (1976)), the issue we must decide is whether the evidence was sufficient to permit the orphans' court to infer that the decedent's promise to repay the claimant was not made "for any reason other" than the promotion of their meretricious relationship. Fully aware that we are bound by the clearly erroneous standard of review, with all its implications, Md. Rule 1086, we hold that the evidence was not a sufficient basis for the conclusion reached by the trial judge.

Initially, we observe that the evidence was hardly sufficient to determine that the participants in this relationship, described by all witnesses and presumably the decedent as well as "both business and personal," "engaged in a meretricious relationship" as described by the court or that "illicit sexual intercourse" as termed in *Baxter* ever ensued between them, let alone amounted to the consideration upon which the contract between them was predicated. The court observed that the decedent had been heard to comment upon the extent of his love for this "woman" and her love for him,

that they saw each other three to four times a week, that claimant knew decedent was married, and that an apartment was maintained by appellant, and mutually used. While acknowledging that this was not a divorce case on the ground of adultery, the court observed that it was

> "satisfied from the testimony of the claimant's witnesses that the facts and circumstances described in this case show a disposition on the part of decedent and the claimant to engage in this type of activity and an opportunity to commit the same."

Acknowledging that the establishment of adultery in a divorce proceeding requires a mere preponderance of the evidence to exclude any reasonable possibility of innocence, *Steinla v. Steinla,* 178 Md. 367, 373 (1940), we concede that the evidence may have been sufficient here to have warranted an inference of adultery for that purpose and upon that standard. The Court of Appeals has judicially noticed that copulation is generally conducted in a secretive setting, especially when illicit, *Laccetti v. Laccetti,* 245 Md. 97, 102 (1967), and has, therefore, liberally permitted proof by circumstantial inference or presumption, all the while cautioning against speculation upon mere suspicion:

— courts should exercise care and circumspection and should never hold that adultery has been committed unless the offense, and not merely a suspicion thereof, is clearly shown. *Kline v. Kline,* 179 Md. 10, 14 (1940);

— the evidence must be clear, unequivocal, satisfactory and convincing, *Dougherty v. Dougherty,* 187 Md. 21, 28 (1946), and of high quality, *Stritmater v. Stritmater,* 187 Md. 699 (1946); *Renner v. Renner,* 177 Md. 689 (1940);

— indiscreet acts raising a suspicion of adultery are not enough, *Pohzehl v. Pohzehl,* 205 Md. 395, 406 (1954); and

— the mere association of a man and woman, however frequent and extended it may be, is not sufficient to prove a charge of adultery, *Hockman v. Hockman,* 187 Md. 340, 344 (1946).

While it does not appear that such stringent scrutiny was given this questionable evidence (never offered to prove adultery but elicited to indicate the setting and likelihood thereof), it might sustain the suspicions of a Shavian observer. We fully agree with appellant, however, that the evidence was sufficient to sustain a contrary conclusion by an equally reasonable factfinder. Surely it would not have sustained a criminal conviction for having committed such an act, for where the State must go forward with, and carry throughout, the burden of proving the crime beyond a reasonable doubt, it may not rest upon eliciting grudging adjectival depictions of the relationship or moral judgments on the propriety of the conduct.

But whether appellant did or did not commit adultery with Mr. Scuderi is but one facet of the proofs necessary to offset the contractual claim she proved. The burden, which shifted to appellees by proof of the contract, was to show that the agreement was grounded upon the immoral aspect of the relationship. In *Lynch v. Rogers, supra,* a jury held that a woman housekeeper was entitled to be compensated for her 10 years of service as a domestic servant to the decedent, despite having given birth to the decedent's child while residing in his home. The Court there also had the issue before them of whether the claimant and decedent's relationship "was so grounded in immorality as to make the consideration for her services as a servant illegal, and the contract void on the ground of public policy." *Id.* at 488. The Court of Appeals affirmed the finding, noting that even if a sexual relationship had grown out of the domestic servant relationship, the latter was not a consideration for the former, despite the fact that it obviously "furnish[ed] opportunity for unlawful cohabitation." See *Baxter* at 162.

Our review of the record in this case compels the reversal of the Orphans' Court on similar reasoning. The services and

expenditures provided by Ms. Donovan, at Mr. Scuderi's request, were undoubtedly stimulated (as expressed by decedent) by the "love" of each for the other, but they were not dependent upon, in consideration for, or necessarily to promote, an unlawful cohabitation.[2]

The consideration here was, as implicitly conceded by the court, a promise to repay in kind or in stock, but it was not in furtherance of the "immoral relation". *Baxter* points out that repayment of a loan *to* a woman (presumably with whom the lender is having an affair to buy clothes or property would be enforceable unless the property purchased was for the furtherance of the immoral relation. *Id.* at 163. Surely, in this era of equal rights, a loan or loans *from* a woman to purchase clothes, property (both real and personal), and services predicated upon repayment, and only remotely related to the sexual aspect of the relationship, should also be enforceable.

Significantly repeated and relied upon in *Baxter* was the testimony of Mr. Baxter that their agreement was conditioned upon the proviso that "we lived together and everything was all right. Of course she could not kick me out, and then try to take the home [he had given her with those strings attached] away from me." Such agreement had been made by Baxter when he gave Wilburn a house and had her execute and hold a mortgage to him, to be recorded only if she predeceased Baxter. The parties quarreled and separated, and she destroyed the mortgage. The Court of Appeals pointed out that what Baxter sought was not a performance of the agreement proved, but a remedy for failure of continuation of the relationship in contemplation of which the agreement had been made. From the facts proved, and admitted to by Baxter, there was found to be a direct connection between the man's providing the house and his living in it with the woman.

Except for one expenditure here, there is *no* evidence from

---

2. "Love" is not the ingredient of an unlawful cohabitation which provides either the illegality or the immorality. In many instances it mitigates the illicitness of such unions.

which an inference can be drawn that either the services provided for Mr. Scuderi, the purchases made at his request, or the loans to him, were predicated upon, or intended to promote or furnish an opportunity for cohabitation.[3] Ample evidence sufficed to infer that the agreement sprang from a mutual love, and a desire to convenience and provide for each other; but so far the Court of Appeals has never held that contracts may not be born from mutual affection or that one must contract only with an enemy or an unknown.

In regard to expenditures for and related to the apartment mutually used by appellant and Mr. Scuderi, there is *some* justification for inferring that it was provided as a setting for their mutual sexual gratification. Since most of the evidence in this regard consisted merely of opinion and suspicions that the relationship was a sexual one, and is the type of evidence depicted by the Court of Appeals in *Lynch, supra,* as neither relevant nor material, we will not excise even those expenditures from our holding. There was testimony that the apartment, although inhabited by appellant, had been used to entertain Mr. Scuderi's business associates and friends. In fact, there was no clear evidence that Mr. Scuderi ever spent a single night with Ms. Donovan at the apartment. To the contrary, her daughter, who lived there with her mother, testified that Mr. Scuderi had to be chauffeured home from Annapolis to Marlow Heights

"every time he came to Annapolis, which was three or four times a week."

None of appellant's testimony was controverted. The personal representatives of Mr. Scuderi's estate did not produce a single witness or submit evidence of any nature.

---

**3.** With the exception of the apartment refurbishing, the loans and services consisted of

"the amount due on catering services, personal shopping services (clothing, furniture and furnishings); bank loans with Peoples Security Bank of Maryland, in the name of the Petitioner, Stella Donovan, proceeds of which were used for deceased['s] benefit with repayment promised; and sums paid to third persons for the benefit of the deceased at his specific request . . . ."

When a claimant has proven a contractual claim, as was done here, it is not her responsibility to further prove that it was not predicated upon an illicit relationship. The burden shifts to appellees, who are denying the claim, to do that, and that affirmative defense should be convincing to the factfinder by at least a preponderance of the evidence. By eliciting admissions from the claimant's witnesses that the parties to the contract were mutually attracted, appeared loving, or even "appear to be" lovers, is insufficient to carry the shifted burden to show that the contract was based upon the consideration of either past or future illicit sexual intercourse. See *Lynch, supra.*

When Ms. Donovan testified, she was never asked a question by appellees regarding her relationship or her conduct with the decedent. Only her friends, her daughter and the deceased's sister were ever asked to express their opinion about that relationship. No evidence was produced that they cohabited. Only broad questions with implications of sexual overtones (such as whether the services provided Ms. Donovan "would be pretty much what you'd expect a wife to be doing for her husband") were asked, and even then objections were sustained. Notwithstanding, however, appellees argue that inference in their brief. The speculative opinions from the witnesses that the couple had become "lovers" or that appellant was Mr. Scuderi's "ladyfriend," simply are not enough under *Baxter* to preclude a right of recovery upon the defense that the contract contravened public policy by providing a quid pro quo for the contract.

Nor are we impressed by appellees' selections of testimony as supporting a *legitimate* inference of that affirmative defense. Appellees argue that:

> "Biagini and Spell testified that Scuderi had given Donovan stock as compensation for services rendered by her but, as testified by Biagini, the stock was returned by Donovan because of an argument between her and Scuderi. This fact, standing alone, would support the lower court's conclusion that the underlying reason for all expenditures

made by Donovan was her lover relationship with Scuderi otherwise, quite obviously, she would have retained the payment tendered to her rather than return it following a lovers argument."

Even if we were impressed by such argument, the extract references do not substantiate what appellees contend. Mrs. Spell's testimony was:

"COUNSEL: Did there come a time when you became aware that that stock that was given was returned?
A Yes.
Q And did you discuss that with Mr. Scuderi?
A I believe I did.
Q Did he tell you what it was returned for, the purpose of it being returned?
A To cash it in."

That testimony was completely in accord with Ms. Donovan's testimony that she returned the stock to be cashed in because of a need for cash. The testimony of Ms. Biagini on the other hand was a vague recollection that the stock was returned after an argument, but she conceded that she was not present.

"A Yes. I knew that she had been given stock and that she had returned it to him.
Q Do you know what the circumstances were of that return in any way? Were you present—
A No, I wasn't present, but I seemed to remember that it was over an argument."

Appellees further contend that:

"Other than the catering services provided for a wake all the services provided by Donovan were outside the regular scope of her business; all of them could have been easily paid for by Scuderi; they all commenced with the commencement of the adulterous relationship between Donovan and Scuderi; they were all provided because it

> stimulated Scuderi's ego and to suggest that they were not a closely interwoven part of and supportive of the adulterous relationship would be more than naive."

We are unimpressed that the agreement stimulated Mr. Scuderi's ego. That does not preclude enforcement; it would, of itself, be a valid consideration for an enforceable contract. None of the implications of appellees' argument make an otherwise valid contract unenforceable.

Whether an agreement is reached as the result of ego, braggadocio, love, kindness or affection does not affect the validity of a contract. Nor is it unenforceable because the contract may never have been struck, "but for" the relationship, even if proven adulterous. That relationship does not disable parties from making an enforceable contract with each other so long as it does not stand or fall upon the sexual relationship. Such a relationship may stimulate the contract; it will not support it. Unlike Mr. Baxter, Mr. Scuderi did not say, "I will pay you back only if we live together." Her recompense was promised without regard to the nature of the relationship, or its continuance. The case will be remanded to the Orphans' Court to enforce the contract it approved.

> *Judgment reversed; case remanded to the Orphans' Court for Prince George's County to enforce the claim.*
> *Costs to be paid by appellees.*

*Wilner, J., concurring:*

I agree entirely with the result reached by the panel. The Orphan's Court having found an express agreement by Mr. Scuderi to reimburse Mrs. Donovan for the various (and considerable) sums she expended at his request or on his behalf, his estate should be required to make good on that agreement.

In order to reach that manifestly just result, however, Judge Lowe had to steer a careful course around the shoals of *Baxter v. Wilburn,* 172 Md. 160 (1937), which he did by (1) casting some doubt as to whether the evidence sufficed to show a "meretricious relationship" in the first instance, and (2) concluding that, in any event, the sums advanced by Mrs. Donovan were not expressly predicated upon a continuation of such a relationship.

I have some difficulty with both of those premises. The evidence seems clear enough to me that Scuderi and Donovan were involved in an amorous, and, at least as to him, an adulterous relationship; and a fair inference could be drawn that Mrs. Donovan would not have advanced the sums involved absent that relationship. It is naive at best to assume that she would have expended $60,000 to buy him clothing, meals, artwork, etc., if he had never entered into the "loving" relationship with her, or had withdrawn from it.

The problem, it seems to me, is with *Baxter* itself, and that is what prompts me to write this concurring opinion.

*Baxter* was decided in 1937. The heart of it is this language appearing at pp. 162-63 of 172 Md. (citations omitted):

> " 'Contracts based upon the consideration, either past or future, of illicit sexual intercourse, or stipulating for such future intercourse, *or in any manner promoting or furnishing opportunity for unlawful cohabitation,'* are void and unenforceable in equity. . . . But the mere fact that a man and a woman are living together in an unlawful relation does not disable them from making an enforceable contract with each other, *if it has no reference to continuation of the relation, or is only incidentally connected with it, and may be supported independently of it."* (Emphasis supplied.)

These principles are couched in very broad language. What is meant, for example, by "unlawful" cohabitation, or "illicit" sexual intercourse? Is the reference point a specific statutory prohibition, some consensus of "public policy," or what a particular judge determines to be "good morals"? *See*

Comment, *Illicit Cohabitation of Parties as Affecting Contracts Made Between Them,* a review of *Baxter* appearing in 2 Md.L.Rev. 291 (1938); *see also* Comment, *Further Concerning Illicit Cohabitation of Parties as Affecting Contracts Made Between Them,* 5 Md.L.Rev. 331 (1941), reviewing *Baxter* in light of *Lynch v. Rogers,* 177 Md. 478 (1940).

The problem becomes especially troublesome in light of the vast changes in societal thinking about cohabitation between unmarried couples since 1937. It has been reported that between 1960 and 1970, the number of cohabitors in the United States increased eight-fold. At least one report estimated that, in 1976, there were as many as six to eight million unmarried cohabitors in this country. *See* Fineman, *Law and Changing Patterns of Behavior: Sanctions on Non-Marital Cohabitation,* 1981 Wis.L. Rev. 275, and in particular footnote 1 on p. 275; *also* Glendon, Marriage and the State: The Withering Away of Marriage, 62 Va.L. Rev. 663, 685, *et seq.* (1976). Bureau of Census statistics indicate a somewhat fewer number of cohabitors — about 1.6 million couples. *See* U.S. Bureau of the Census, Dept. of Commerce, Current Population Reports, Series P-20, No. 365, *Marital Status and Living Arrangements,* Oct., 1981.

As pointed out by Professor Mary Ann Glendon in her Virginia Law Review article, *supra,* "[c]ohabitation is favored among young People[,] among pensioners and others receiving benefits terminable or reducible upon formal marriage, and increasingly among other diverse social groups." *Id.* at 686; footnotes omitted. This is not necessarily the result of sexual promiscuity; and, indeed sexual attraction, though often present, may at best be an incidental consideration. Men and women enter into these relationships for a variety of reasons. Glendon observed (*Id.* at 687):

"Motivations to enter informal rather than legal marriage include economic advantages as in the case of many elderly people, inability to enter a legal marriage, unwillingness to be subject to the legal effects of marriage, desire for a 'trial mar-

riage,' and lack of concern with the legal institution. This lack of concern is nothing new among groups accustomed to forming and dissolving informal unions without coming into contact with legal institutions. Among these groups legal marriage is but an aspect of the irrelevance of traditional American family law, law that is viewed as being property-oriented and organized around the ideals of a dominant social group. Lack of concern with marriage law has been growing, however, among many who definitely are not outside the mainstream of American life. Until recently these converts accepted unquestioningly the traditional structures of the enacted law, but they now find that on balance the enacted law offers no advantages over informal arrangements." (Footnotes omitted.)

To some extent, the increasing desirability of cohabitation without benefit of clergy is actually promoted by our public laws and institutions. For example:

(1) Where both parties are wage earners, the Federal income tax laws, since 1969, have provided an economic incentive for couples to remain unmarried. *See* Bittker, *Federal Income Taxation and the Family,* 27 Stanford L.Rev. 1389, 1429, *et seq.* (1975); Note, *The Haitian Vacation: The Applicability of Sham Doctrine to Year-End Divorces,* 77 Mich.L.Rev. 1332 (1979). This "marriage penalty" has been partially alleviated by Section 103 of the Economic Recovery Tax Act of 1981, Pub. L. 97-34 (1981), but it still exists. *See* S.Rep. No. 97-144, 97th Cong., 1st Sess., pp. 29-33 (July 6, 1981), reprinted in 6 U.S. Code Cong. & Ad. News 191, 222-26 (Aug. 1981).

(2) Older people, on fixed incomes, often cannot survive living alone; and, especially where they rely on social security or pension benefits attributable to the earnings of a deceased spouse, there is a clear disincentive to remarry. *See* Glendon's article, *supra,* 62 Va.L.Rev. at 687 (footnote 99).

(3) Conversely, a number of traditional disincentives to

unmarried cohabitation have been (or are being) swept away as courts have begun to apply to such status some of the rights, obligations, and benefits that once were reserved to the marital relationship. *See, for example, Marvin v. Marvin,* 557 P.2d 106 (Cal. 1976); *Kozlowski v. Kozlowski,* 403 A.2d 902 (N.J. 1979); *Carlson v. Olson,* 256 N.W.2d 249 (Minn. 1977); *Beal v. Beal,* 577 P.2d 507 (Or. 1978); *but compare Hewitt v. Hewitt,* 394 N.E.2d 1204 (Ill. 1979); *also Markham v. Colonial Mortgage Service Co., Associates, Inc.,* 605 F.2d 566 (D.C. Cir. 1979); Comment, *Protection of Unmarried Couples Against Discrimination In Lending Under The Equal Credit Opportunity Act,* 93 Harv.L.Rev. 430 (1979).

All of this indicates a somewhat grudging and still incomplete, but nevertheless changing view toward the overall relationships between men and women, and toward unmarried cohabitation in particular. It is a view that does not square *entirely* with the broad principles enunciated in *Baxter.*

I do not suggest that *Baxter* be overruled; only that it be reviewed and limited. Agreements to pay value for acts of prostitution or adultery ought to remain judicially unenforceable because the Legislature has expressly declared such acts to be illegal and therefore against public policy. To enforce those types of agreements would create a contradiction between the civil and the criminal law. But when we venture much beyond that, we run into a real thicket that courts ought to avoid. For example:

(1) Is a cohabitating relationship founded upon economic or other considerations "meretricious" merely because it also involves or includes sexual contact between the parties?

(2) Would it make a difference if (a) the sexual contact is an important or even critical element in the relationship, or (b) if one or both of the parties is legally married to someone else but separated (i) by decree of divorce a *mensa et thoro,* (ii) by formal agreement, (iii) by mere acquiescence, or (iv) without agreement?

(3) In which, if any, of these cases, should the courts

decline to enforce reciprocal rights and obligations arising from the parties having co-signed leases, mortgages, chattel or personal loans, or having taken title to property jointly, where such actions were taken in consideration of the overall relationship between the parties and with a clear view toward its continuation?

(4) Should a different rule apply where, as here, the relationship in question falls short of actual, full-time cohabitation, but involves sexual contact as part of a broader spectrum of personal ties?

These are things that the Court of Appeals, or the General Assembly, should look at anew. We, of course, as Judge Lowe correctly observed, are bound by the law as it presently exists. I would hold, however, if I were free to do so, that a contract such as that involved here should be enforceable even if it was expressly conditioned on the fact and the continuation of the overall relationship between Donovan and Scuderi, one element of which was the periodic commission of adultery. I would restrict the bar of *Baxter* to express contracts for sexual acts that the law itself declares to be illegal. In this area, at least, I would divorce the law of contracts from what appears to be a shifting and somewhat uncertain public sense of morality.