572 A.2d 501

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**Robin K.A. FICKER.**

**Misc. Docket (Subtitle BV) No. 11, Sept. Term, 1988.**

Court of Appeals of Maryland.

April 18, 1990.

Melvin Hirshman, Bar Counsel, and John C. Broderick, Asst. Bar Counsel, for Atty. Grievance Com'n of Maryland.

Stanley J. Reed, Bethesda, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL,* JJ.

ADKINS, Judge.

The Attorney Grievance Commission (AGC), acting through Bar Counsel, charged Robin K.A. Ficker (Ficker) with violations of the Code of Professional Responsibility (for acts that occurred on or before 31 December 1986) and of the Rules of Professional Conduct (for acts that occurred

---

* Blackwell, J., now retired, participated in the hearing and conference of this case while an active member of this Court but did not participate in the decision and adoption of this opinion.

thereafter).[1] Pursuant to Maryland Rule BV9 b, we referred the matter to Judge Peter Messitte of the Circuit Court for Montgomery County to make findings of fact and conclusions of law.

The charges against Ficker related to three sets of circumstances, the first involving Angela A. Daley, the second Lewis Keith Wilcom, and the third an advertisement Ficker had placed soliciting "palimony" cases. Judge Messitte held an evidentiary hearing. In the *Daley* matter he found that Ficker had in two respects neglected a legal matter in violation of DR 6–101(A)(3), Code of Professional Responsibility, and that he had engaged in conduct prejudicial to the administration of justice in violation of DR 1–102(A)(5). In the *Wilcom* case, Judge Messitte again found Ficker guilty of neglect and conduct prejudicial to the administration of justice under the Code. In addition, the judge concluded that Ficker had "habitually" violated a rule of court, thereby also violating DR 7–106(C)(7). Additionally, Judge Messitte found violations of Rule of Professional Conduct 1.3 (diligence). With respect to the "palimony" matter, Judge Messitte held that the AGC had failed to establish by clear and convincing evidence that the advertisement was misleading in violation of Rule 7.1, Rules of Professional Conduct.[2]

Ficker excepts to Judge Messitte's findings of fact, conclusions of law, and recommendations in the *Daley* matter.

---

1. By order dated 15 April 1986, we adopted the Rules of Professional Conduct effective 1 January 1987. The same order continued the Code of Professional Responsibility "in full force and effect [to] govern the conduct of attorneys until January 1, 1987." 13:11 Md. Reg. 3 (23 May 1986).

2. In a careful and comprehensive opinion, Judge Messitte found that Ficker had not committed several other violations alleged in connection with the *Daley* and *Wilcom* cases. But he found violations of DR 1–102(A)(1) in *Daley* and *Wilcom*, and of Rule 8.4(a) in *Wilcom*. Each of these provisions proscribes violation of a rule of ethics. We shall refer no further to either of these rules; if an attorney has violated a substantive rule of ethics, it is enough that he or she be sanctioned for that transgression. There is no need to discuss as an additional violation the flouting of a rule that prohibits violating another rule.

The AGC excepts to the factual findings and legal conclusions that lead to Judge Messitte's holding that Ficker did not violate Rule 7.1. No one excepts to the findings or conclusions in the *Wilcom* case. We shall summarize them, nevertheless, since they must be considered when we determine the appropriate sanctions for Ficker's conduct. And because of some factual similarities, we discuss the *Daley* and *Wilcom* cases together. We shall reject Ficker's exceptions as well as those advanced by the AGC.

## I. Daley and Wilcom

Ficker encountered Angela Daley and Lewis Wilcom in 1986, in separate cases. Ficker had been practicing law since 1973 and in 1986 was a sole practitioner with an office in Bethesda, Montgomery County. He employed one full-time clerk with no legal training. He maintained no formal "diary" or "tickler" system. His only schedule of clients' court dates was a large desk calendar upon which he endeavored to make appropriate entries. His practice "consisted primarily of the representation of clients charged with drinking and driving offenses" and Daley and Wilcom each retained him in connection with drinking and driving charges.

### A. Angela Daley

Daley, a resident of Johnstown, Pennsylvania, was charged with violation of § 21–902 of the Transportation Article, Maryland Code (1988 Repl.Vol., 1989 Cum.Supp.) (driving while intoxicated or under the influence of alcohol), and with a related offense. She was to appear for trial in the District Court of Maryland sitting in Frederick County at 9:00 a.m. on 4 December 1986.

On 30 October 1986 Daley met with Ficker in his office. She retained him to represent her and paid $200 on account of his $599 fee. Ficker agreed to appear on the 4 December trial date. But he failed to enter the trial date on his desk

calendar. He also failed to enter his appearance in the District Court as required by Md. Rule 4–214(a).[3]

On 4 December Daley travelled from her Pennsylvania residence to Frederick and awaited the docket call in District Court. Ficker never appeared. He later explained that he had simply forgotten about his commitment to be there on Daley's behalf. No one attempted to contact Ficker. Daley's case was continued until the afternoon, at which time she pleaded guilty, was fined $250, and placed on probation before judgment. That disposition, the AGC and Ficker agree, was reasonable under the circumstances.

The next day Daley phoned Ficker and told him what had occurred. He apologized and immediately refunded the $200 retainer.

### B. Lewis Wilcom

Like Daley, Wilcom was charged with a violation of § 21–902 of the Transportation Article. Wilcom's trial was also to be held in the District Court in Frederick County. The trial date was 23 December 1986.

On 9 December 1986 Wilcom and his mother met with Ficker and retained the lawyer to appear on Wilcom's behalf for a fee of $599. This time Ficker entered the trial date on the desk calendar. But he again violated Rule 4–214(a) by failing to enter his appearance.

On 23 December both Wilcom and Ficker were in Frederick. The former was in the courtroom and was unaware that the latter was nearby. Ficker was in the hallway searching for the arresting officer. When Wilcom's case was called, it was continued, at the State's request, because the arresting officer was not on hand. The new trial date was 3 March 1987.

---

**3.** Maryland Rule 4–214(a) in pertinent part mandates that "[c]ounsel retained ... to represent a defendant shall enter an appearance in writing within five days after accepting employment, ... or after the filing of the charging document in court, whichever occurs later."

Ficker and Wilcom never made contact on 23 December. But Ficker testified that on that date, he did enter his appearance on behalf of Wilcom. Judge Messitte found that the docket entries in Wilcom's case did not show the entry of Ficker's appearance on 23 December or at any other time.

On 3 March 1987 Wilcom appeared in court, but Ficker did not. Because the court records did not show his appearance, he had not been notified of the 3 March trial date. Wilcom explained that Ficker was representing him, and the court granted a continuance to 24 June 1987.

Ficker had actual notice of the 24 June date; Wilcom's mother told him about it. But despite that, Ficker undertook to appear for another client in the Circuit Court for Montgomery County on the same date. In an attempt to resolve the conflict, he sought yet another continuance of Wilcom's case.[4]

The "comedy" of errors proceeded. Because Ficker put the wrong zip code on the envelope containing the motion for continuance that he tried to send to the District Court in Frederick, it never arrived there. Ficker, however, assumed both that the motion had arrived and that it would be granted. Without checking further, he advised Mrs. Wilcom that the case would be continued and that her son need not appear for trial on 24 June.

---

4. This action was in apparent violation of an administrative order issued by the Chief Judge of the Court of Appeals on 2 June 1978 and amended on 9 October 1980 and 30 December 1980. That order, entitled "Revised Administrative Order Establishing Priorities When There Are Conflicts Between Case Assignments in Trial Court," (1) directs counsel to "assure the absence of conflicting assignments on any date he indicates he is available for trial;" (2) instructs counsel who "accepts employment in a case in which a date ... for ... trial has already been set after he has been notified of a conflicting assignment" that he or she should not expect to be granted a continuance; and (3) ordinarily gives priority, when a conflict exists to the court in which the earlier assignment for trial was made [in this case, the District Court in Frederick]. 8:1 Md.Reg. 16 (9 Jan.1981).

Despite that advice, Wilcom did appear in court on 24 June. Ficker, relying on the nonexistent continuance, did not. The prosecutor *had* received a copy of Ficker's motion and showed it to the trial judge, who offered Wilcom yet another postponement. Wilcom elected to proceed pro se. He pled guilty to driving under the influence and received probation and a fine.

When Ficker learned of this, he represented Wilcom without charge at a de novo appeal. Wilcom was convicted of driving under the influence. The court imposed probation and a fine almost double that imposed in the District Court.

## C. Ficker's Exceptions

■ Ficker insists that he did not violate DR 6–101(A)(3) in the *Daley* matter because a single inadvertent failure to appear is not neglect of a legal matter. Nor is his failure to enter his written appearance neglect, he says, because that was not shown to be part of a pattern of neglect.[5] The text for his argument is American Bar Association Committee on Ethics and Professional Responsibility Informal Opinion 1273 (1973). The Committee opined that

> Neglect involves indifference and a consistent failure to carry out the obligations which the lawyer has assumed to his client or a conscious disregard for the responsibility owed to the client. The concept of ordinary negligence is different. Neglect usually involves more than a single act or omission. Neglect cannot be found if the acts or omissions complained of were inadvertent or the result of an error of judgment made in good faith.

*Accord,* ABA Comm. on Ethics and Professional Responsibility, Informal Op. 1428 (1979); ABA Comm. on Ethics and

---

**5.** DR 6–101(A) provides that:

    A lawyer shall not:

             \*     \*     \*     \*     \*     \*

    (3) Neglect a legal matter entrusted to him.

Professional Responsibility, Informal Op. 1467 (1981); Informal Opinion 1273 also is cited in R. Rotunda, *Professional Responsibility* 86 (1988).

We have considered the ABA Committee's construction of DR 6–101(A)(3), but decline to follow it. First, it is an advisory opinion given in a vacuum with the conclusion already assumed in the question submitted to the Committee. The opinion responds to this question: *"Assume a lawyer has not neglected the matter entrusted to him,* is his ordinary negligence involving an affirmative act or omission grounds for disciplinary action?" Informal Op. 1273, *supra* [emphasis supplied].

Second, we already have read DR 6–101(A)(3) more broadly than has the ABA Committee. In *Attorney Griev. Comm'n v. Montgomery,* 296 Md. 113, 460 A.2d 597 (1983), we considered, among other things, a complaint of Gerald McCants. An action brought by Montgomery on behalf of McCants was dismissed at a hearing attended by McCants but not by his lawyer, Montgomery. 296 Md. at 119, 460 A.2d at 600. We concluded that Montgomery "was not present in court when the dismissal took place and this alone would constitute neglect." *Id.* We did not speak of patterns or consistent failure or conscious disregard of responsibility, nor did we suggest that inadvertence might be a defense. We found a single failure to appear to be neglect. We believe Ficker's single failure to appear also was neglect, as was his failure to enter his written appearance. *See also Attorney Griev. Comm'n v. Myers,* 302 Md. 571, 579, 490 A.2d 231, 235 (1985) (single instance of failure to include attestation clause and witness signature lines on will is neglect).

Given the duty of zealous representation that a lawyer owes the client, we are not persuaded that a failure to appear caused by poor office practices or simple forgetfulness can never be neglect. Nor are we convinced that inadvertent failure to comply with a mandatory rule like

Rule 4–214(a) can never be a violation of DR 6–101(A)(3).[6]

Ethical Consideration 6–1 (under Canon 6 of the Code of Professional Responsibility) directs a lawyer to "act with ... proper care in representing clients." Ethical Consideration 6–4 also admonishes a lawyer who has undertaken representation to "use proper care to safeguard the interests of his client." Derelictions of the sort involved here can result in serious harm to the client, even when the cause is no more than carelessness. Both Daley and Ficker are fortunate that no major prejudice occurred in this case, but we reject Ficker's argument that a single act of negligence that causes no serious harm is not, as a matter of law, a violation of DR 6–101(A)(3).

We agree with Judge Messitte that inadvertence, lack of a persistent pattern of conduct, lack of prejudice to the client, and other such matters "more properly pertain to mitigation of any sanction, rather than the fact of violation." *See Maryland State Bar Ass'n v. Phoebus*, 276 Md. 353, 362, 347 A.2d 556, 561 (1975) ("[w]here an attorney has been shown to have been negligent, or inattentive to his client's interests ... in violation of the canons ..., the imposition of some disciplinary sanction against him may be warranted; the extent of the discipline to be applied, however, is generally dependent upon the severity of the conduct and the particular facts and circumstances surrounding it").

Ficker also insists that his inadvertent failure to be present at Daley's trial cannot be conduct prejudicial to the administration of justice in violation of DR 1–102(A)(5).[7]

---

**6.** Judge Messitte's discussion of Ficker's failure to enter his appearance also included a finding that this was part of a pattern demonstrated by the similar failure in the *Wilcom* case. Ficker does not contest the finding that he had entered no appearance in the *Wilcom* matter, and we do not believe that the judge's "pattern" finding was clearly erroneous.

**7.** In pertinent part DR 1–102 provides:

He argues that to pass constitutional muster the term "conduct prejudicial to the administration of justice" must be narrowly defined or limited to "particularly egregious conduct" or "conduct flagrantly violative of accepted professional norms." *In re Hinds,* 90 N.J. 604, 632, 449 A.2d 483, 498 (1982) (citing *Committee on Professional Ethics v. Durham,* 279 N.W.2d 280 (Iowa 1979)). *Hinds* does not hold, however, that DR 1–102(A)(5) would be unconstitutional if not construed as Ficker wishes; it says only that if so construed, the rule is sufficiently definite.

More to the point, we have very recently concluded that Rule 1–102(A)(5) "is neither facially overbroad nor void for vagueness...." *Attorney Griev. Comm'n v. Alison,* 317 Md. 523, 538, 565 A.2d 660, 667 (1989). There, we pointed out that " '[t]he regulation ... applies only to lawyers, who are professionals and have the benefit of guidance provided by case law, court rules and the "lore of the profession." *In re Snyder,* ... 472 U.S. [634] at 645, 105 S.Ct. [2874] at 2881 [86 L.Ed.2d 504 (1985) ].' " 317 Md. at 538, 565 A.2d at 667 (quoting *Howell v. State Bar of Texas,* 843 F.2d 205, 208 (5th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 531, 102 L.Ed.2d 563 (1988)). *See also Attorney Griev. Comm'n v. Korotki,* 318 Md, 646, 667–668, 569 A.2d 1224, 1234–1235 (1990). In that case we upheld DR 2–106, prohibiting excessive fees, against a vagueness challenge. Judge Rodowsky, for the Court, observed that "[t]he regulations governing conduct of members of the bar are civil and not criminal" and subject to more tolerant scrutiny than an enactment imposing criminal penalties. " 'All that is necessary is that the [disciplinary] rule prescribe general principles so that those subject to the rule are reasonably able to determine what conduct is appropriate.' " 318 Md. at 667, 569 A.2d at 1235 (quoting *In re Charges of Unprofessional Conduct Against N.P.,* 361 N.W.2d 386, 394 (Minn.), *appeal*

---

(A) A lawyer shall not:

\*   \*   \*   \*   \*   \*

(5) Engage in conduct that is prejudicial to the administration of justice."

*dismissed,* 474 · U.S. 976, 106 S.Ct. 375, 88 L.Ed.2d 330 (1985)).

■ Ficker fares no better with his contention that inadvertent failure to appear in court cannot constitute conduct prejudicial to the administration of justice. Unlike the respondent in *Matter of Alexander,* 496 A.2d 244, 250 (D.C.App.1985), a case Ficker relies on, Ficker knew precisely when Daley's trial was to be held and had agreed to be there. His negligent failure to be present at that trial interfered with the orderly disposition of the court's docket; a trial set for 9:00 a.m. had to be postponed until afternoon.

We have held that failure to be punctual in a scheduled court appearance is "not only detrimental to the administration of justice but also constitute[s] discourteous conduct degrading to the tribunal." *Attorney Griev. Comm'n v. Howard,* 282 Md. 515, 523, 385 A.2d 1191, 1196 (1978). We have held that an attorney who fails to appear punctually at a trial is guilty of a contempt of court. *Kandel v. State,* 252 Md. 668, 250 A.2d 853 (1969). Misconduct of that sort is a contempt of court because it interferes with the conduct of court business.

> [A]n attorney plays such an integral role in the judicial process that without his presence the wheels of justice must, necessarily, grind to a halt. The attorney's absence from the courtroom is immediately cognizable by the judge and intrudes upon the operation and dignity of the court.

*Murphy v. State,* 46 Md.App. 138, 146, 416 A.2d 748, 753 (1980).

If being late for a scheduled court appearance interferes with the administration of justice, it is obvious that being altogether absent from a scheduled trial does so as well. As in the case of neglect, the circumstances surrounding the failure to appear and the actual consequences of that failure are matters that go to the question of sanction.

We overrule Ficker's exceptions to Judge Messitte's conclusions of law in the *Daley* matter.

## II. "Palimony"

### A. The Facts

■ We now turn to the "palimony" problem. The facts on which the charges against Ficker are based are simple; the resolution of the question of whether these facts establish a violation of Rule 7.1, Rules of Professional Conduct, is more complex.[8]

In 1987, Ficker placed advertisements in the *Washington Post* and the *Washington Times*. They read:

### PALIMONY

#### Suits Against Wealthy Men

#### Robin Ficker, Atty.

#### 652–1500

The ads ran once in each of two successive weeks in each paper. No one responded to the ads, and Ficker withdrew them.

Judge Messitte found that Ficker, who had a very limited divorce practice, had never had an occasion to file a law suit seeking "palimony." The lawyer chose to use the term "palimony" because it was "punchy" and would give him more "bang for my buck." He conceded that when he placed the ads, he knew that "palimony" was not a precise term and that "it means different things to different people, depending upon their fact circumstances." Ficker "knew that any recovery had to be based on a contractual right, or

---

**8.** Rule 7.1 in pertinent part provides:

A lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services. A communication is false or misleading if it:

(a) contains a material misrepresentation of fact or law, or omits a fact necessary to make the statement considered as a whole not materially misleading;

(b) is likely to create an unjustified expectation about results the lawyer can achieve, or states or implies that the lawyer can achieve results by means that violate the rules of professional conduct or other law. . . .

a promise other than simply based on the meretricious, or sexual aspect of the relationship." He sought to limit his clients to those with "suits against wealthy men" as a "screening device meant to target situations where people had substantial involvements, and could actually afford to have an attorney represent their interest."

Before Judge Messitte, Bar Counsel argued that "palimony" meant "alimony for a pal" and that Maryland law had never recognized such a cause of action. Since the ads invited clients to retain Ficker to sue on a nonexistent cause of action, the ads were misleading. Ficker, on the other hand, asserted that "palimony" had a very broad meaning and had been recognized in fact, if not by name, in *Baxter v. Wilburn*, 172 Md. 160, 190 A. 773 (1937), and *Donovan v. Scuderi*, 51 Md.App. 217, 443 A.2d 121, *cert. denied*, 293 Md. 616 (1982).

Judge Messitte approached the problem as a factual issue. He received testimony from Professor William I. Weston of the University of Baltimore School of Law, who was accepted as an expert in both domestic relations law and ethics. He consulted dictionaries and treatises about language and how it develops. He examined newspaper and magazine articles. He concluded that " 'palimony' is already a legitimate word fairly used in a broad sense ... as referring to the collective rights of unmarried cohabitants." He expressed the view that, in that broad sense, Maryland does recognize a cause of action for "palimony" because this Court, in *Baxter, supra*, said:

> But the mere fact that a man and a woman are living together in an unlawful relation does not disable them from making an enforceable contract with each other, if it has no reference to continuation of the relation, or is only incidentally connected with it, and may be supported independently of it. A loan to the woman to buy herself clothes would be lawful, and upon the same reasoning a loan to buy real property not for the furtherance of the immoral relation would be enforceable.

172 Md. at 162–163, 190 A. at 774. *See also Donovan,* 51 Md.App. at 228, 443 A.2d at 127, where the Court of Special Appeals reasoned that

> [w]hether an agreement is reached as the result of ego, braggadocio, love, kindness or affection does not affect the validity of a contract. Nor is it unenforceable because the contract may never have been struck, "but for" the relationship, even if proven adulterous. That relationship does not disable parties from making an enforceable contract with each other so long as it does not stand or fall upon the sexual relationship.

The judge concluded that because "palimony" has a broader meaning than merely "alimony for [or from] a pal," it refers to a cause of action recognized in Maryland and, therefore, Ficker had "neither advertised falsely nor . . . misled anyone." He found no violation of Rule 7.1.[9] The Attorney Grievance Commission excepted.

### B. Discussion

We agree with Judge Messitte that Ficker's ads were tasteless. "Bad taste," however, is not a synonym for "misleading," nor does "crassness" necessarily equate with "false advertising." We are unable to hold that Judge Messitte's factual findings as to the meaning of "palimony" were clearly erroneous. And his conclusion that the ads did not violate Rule 7.1 was firmly based on those factual findings.

The word "palimony" seems to have entered the language in connection with the case of *Marvin v. Marvin,* 18 Cal.3d 660, 557 P.2d 106, 134 Cal.Rptr. 815 (1976), although it was not used in that case. In *Marvin,* the Supreme Court of California held that the provisions of that state's Family Law Article did not govern the distribution of property

---

**9.** As to the "suits against wealthy men" part of the ads, Judge Messitte thought it was tasteless, but accepted Ficker's testimony that it was an economic screening device against which the judge saw no prohibition.

between unmarried cohabitants. But the *Marvin* court also said that courts would enforce express or implied contracts between unmarried cohabitants, including contracts for property division and for support, to the extent that the contracts were not explicitly founded on meretricious sexual services. 18 Cal.3d at 665, 557 P.2d at 110, 134 Cal.Rptr. at 819. Counsel in the case, however, coined the term "palimony" to describe the *Marvin* case. *See* Los Angeles Daily Journal, 16 May 1989, at 6, col. 3. The word was picked up by the press. *See, e.g.,* Footlock and Kasindorf, *An Unmarried Woman,* Newsweek, Apr. 30, 1979, at 70. It has now become a part of our language.

As noted, we have no quarrel with Judge Messitte's finding to that effect or with his findings that language evolves and the meanings of words change. All this is obvious. Nor was the judge clearly erroneous when he found (adopting Professor Weston's testimony) that

> "Palimony is a generic term that describes a series of remedies. It is much like the term civil rights, or torts, although obviously not as well developed. The concept being a series of rights and remedies as between nonmarried cohabitants.
>
> "Obviously the majority of those rights and remedies involve contracts, but there are other rights and remedies that have been enforced around the country as well, all under the rubric of palimony cases." [10]

This "broad" definition of "palimony" is consistent with *Marvin,* which spoke of remedies such as express contract, implied contract, and constructive trust, so long as meretricious sexual services were not the basis for the claim. Thus, *Black's Law Dictionary* 1000 (5th ed. 1979) explains that "palimony"

---

**10.** There are limits on the admissibility of expert testimony as to the meaning of words. *See Truck Ins. Exch. v. Marks Rentals,* 288 Md. 428, 433–434, 418 A.2d 1187, 1190 (1980). The AGC, however, does not raise that issue before us. We assume, without deciding, that Professor Weston's expert testimony about the meaning of "palimony" was admissible.

has a meaning similar to 'alimony' except that award, settlement or agreement arises out of nonmarital relationship of parties (*i.e.* nonmarital partners). It has been held that courts should enforce express contracts between nonmarital partners except to the extent the contract is explicitly founded on the consideration of meretricious sexual services, despite contention that such contracts violate public policy; that in the absence of express contract, the court should inquire into the conduct of the parties to determine whether that conduct demonstrates implied contract, agreement of partnership or joint venture, or some other tacit understanding between the parties, and may also employ the doctrine of quantum meruit or equitable remedies such as constructive or resulting trust, when warranted by the facts of the case. *Marvin v. Marvin,* 557 P.2d 106, 18 Cal.3d 660, 134 Cal.Rptr. 815.

*See generally* S. Green and J. Long, *Marriage and Family Law Agreements* § 3.15 at 188 (1984). *And see, e.g., Kozlowski v. Kozlowski,* 80 N.J. 378, 403 A.2d 902 (1979); *Morone v. Morone,* 50 N.Y.2d 481, 413 N.E.2d 1154, 429 N.Y.S.2d 592 (1980); *Kinnison v. Kinnison,* 627 P.2d 594 (Wyo.1981); *Glasgo v. Glasgo,* 410 N.E.2d 1325 (Ind.App. 1980). None of these cases uses the word "palimony" (*but see Crowe v. DeGioia,* 203 N.J.Super. 22, 30, 495 A.2d 889, 900 (1985), which does); but all of them apply broad principles consistent with the *Black* definition.[11]

It is, of course, true that the meaning of "palimony" is not limited to the type of actions recognized in *Marvin* and other cases; *see* n. 11, *supra,* and accompanying text. The word can be understood as meaning (as the AGC insists) alimony from or for a pal, as opposed to a *Marvin*-type action. For example, the *Random House Dictionary of the English Language* 1397 (2d ed. 1987) tells us that

---

**11.** This listing does not purport to be a comprehensive compilation of cases that adopt the *Marvin v. Marvin,* 18 Cal.3d 660, 557 P.2d 106, 134 Cal.Rptr. 815 (1976), and *Black's Law Dictionary* approaches to "palimony." It is illustrative only.

"palimony" is "a form of alimony awarded to one of the partners in a romantic relationship after the breakup of that relationship following a long period of living together...." *See also, e.g.,* XI *Oxford English Dictionary* 95 (2d ed. 1989), W. Statsky, *West's Legal Thesaurus/Dictionary* 555 (1985); M. Bernard, E. Levine, S. Presser & M. Stecich, *The Rights of Single People* 55 (1985). Both Professor Weston and Judge Messitte recognized this ambiguity. But ambiguity does not necessarily translate into a violation of Rule 7.1.

Professor Weston, asked whether "the fact that one person may understand palimony to mean something different than another person" made the word "misleading, inherently," replied:

No. It does not. Because the very nature of the term is to make people aware of a class of action that involves nonmarried cohabitants. The fact of the matter is when the advertisement is read, the very worst that happens is the person calls the lawyer, goes to the lawyer's office and learns more about it.

So that the term itself is not misleading, inherently misleading and the consequences pose absolutely no damage whatsoever.

Put otherwise, the problem seen by the AGC is that Ficker's ads were not complete because they failed to limit themselves to the contractual component of "palimony," or to disclaim the "alimony for a pal" aspect. It is certainly true that in connection with professional advertising more disclosure is better than less. *Bates v. State Bar of Arizona,* 433 U.S. 350, 373–374, 97 S.Ct. 2691, 2703–2704, 53 L.Ed.2d 810, 829 (1977). But the *Bates* Court also observed that while "[a]dvertising does not provide a complete foundation on which to select an attorney, ... it seems peculiar to deny the consumer, on the ground that the information is incomplete, at least some of the relevant information needed to reach an informed decision." 433 U.S. at 374, 97 S.Ct. at 2704, 53 L.Ed.2d at 829–830.

The AGC directs our attention to *Barnett v. Md. State Bd. of Dental Ex.*, 293 Md. 361, 444 A.2d 1013 (1982). In that case we held that a dentist's use of the word "polydontics" in an advertisement was deceptive and misleading. This word, we explained, could easily be confused with various other words defining particular dental specialties, and thus could lead the public to believe that Dr. Barnett possessed expertise in such a speciality. In point of fact, however, the word was misleading because it did not refer to *any* recognized speciality; it was simply manufactured by Dr. Barnett. 293 Md. at 370–372, 444 A.2d at 1017–1018.

Obviously, "palimony" also is a manufactured word. It was not manufactured by Ficker, however. As Judge Messitte correctly explained " 'palimony' is already a legitimate word fairly used in a broad sense." It was not a violation of Rule 7.1 for Ficker to use the word in that broad sense; Judge Messitte also was correct in pointing out that Maryland appellate courts have recognized that a contract between cohabiting but unmarried persons may be enforceable if not based on a meretricious sexual relationship. *See Baxter v. Wilburn* and *Donovan v. Scuderi*, both *supra*, as well as *Lynch v. Rogers*, 177 Md. 478, 10 A.2d 619 (1940). Indeed, our very recent decision in *Unitas v. Temple*, 314 Md. 689, 552 A.2d 1285 (1989), implicitly recognizes the enforceability of such a contract. *Unitas* involved a purported contract between two unmarried people. It did not meet the requirements of the Statute of Frauds. But Judge Rodowsky, for the Court, took care to point out that the unenforceability of the contract was not caused by the problem of a meretricious relationship or by an effort to seek "palimony" in the "alimony for a pal" sense. 314 Md. at 701 n. 6, 552 A.2d at 1291 n. 6.

Judge Messitte believed that the AGC's case for violation of Rule 7.1 "falls woefully short by [the clear and convincing evidence standard] or indeed quite likely by any lesser standard." Proof by clear and convincing evidence is indeed what is required to support factual findings in an attorney discipline matter. Md. Rule BV10 d. We, at any

rate, do not find the judge's fact-findings with respect to "palimony" clearly erroneous. As a consequence, the AGC's exceptions are overruled.

### III. Sanctions

We have overruled Ficker's exceptions and those of the AGC. Consequently, Ficker has been found to be in violation of the ethics provisions prohibiting neglect, conduct prejudicial to the administration of justice, and habitual violation of a rule of procedure in the *Daley* and *Wilcom* matters, and of lack of diligence in the latter. The remaining question is that of an appropriate sanction.

The purpose of attorney "disciplinary proceedings is to protect the public rather than to punish" the errant lawyer. *Attorney Griev. Comm'n v. Kolodner,* 316 Md. 203, 208, 557 A.2d 1332, 1334 (1989). And the "severity of sanctions depends upon the facts and circumstances of the particular case." *Attorney Griev. Comm'n v. Kandel,* 317 Md. 274, 281, 563 A.2d 387, 390 (1989).

Both *Daley* and *Wilcom* occurred within approximately the same time frame. Since then, Judge Messitte found, Ficker "has improved his office practice, ... hir[ed] an associate, [required] the associate to maintain a separate calendar of court dates, and maintain[s] in all three separate court calendars in the office." Additionally, the judge believed that Ficker appreciates his responsibility to his clients, understands the requirements of Md. Rule 4–214(a), "seems committed to appear timely at his Court proceedings; and he has given to understand that he cannot again take the filing or approval of his motions for granted." The judge concluded that "[a]ll things considered, [Ficker] appears to have learned his lesson" with respect to the ethical lapses illustrated by *Daley* and *Wilcom.* Under all the circumstances, we believe a reprimand to be the appropriate sanction for those derelictions.[12]

---

12. Judge McAuliffe would impose a 30–day suspension.

**324**

IT IS SO ORDERED. RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE BV15 c FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST ROBIN K.A. FICKER.